[Cite as *Fry v. Wheatland Tube, L.L.C.*, 2019-Ohio-1453.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT


HOWARD FRY                               :       JUDGES:
                                         :
                                         :       Hon. W. Scott Gwin, P.J.
      Plaintiff-Appellant                :       Hon. Patricia A. Delaney, J.
                                         :       Hon. Earle E. Wise, Jr., J.
-vs-                                     :
                                         :       Case No. 18 CA 7
                                         :
WHEATLAND TUBE, LLC, ET AL.              :
                                         :
                                         :
      Defendants-Appellees               :       O P I N I O N



CHARACTER OF PROCEEDING:                 Civil appeal from the Guernsey County
                                         Court of Common Pleas, Case No.
                                         CV016-000334



JUDGMENT:                                Affirmed in Part, Reversed and
                                         Remanded in Part



DATE OF JUDGMENT ENTRY:                  April 17, 2019



APPEARANCES:

For Plaintiff-Appellant:                 For Defendants-Appellees:

LEWIS A. ZIPKIN                          BRUCE G. HEAREY
IN SON J. LOVING                         MONICA L. LACKS
APRIL M. BENSIMONE                       127 Public Square
3637 South Green Rd.                     4100 Key Tower
Beachwood, OH 44122                      Cleveland, OH 44114

*Gwin, P.J.*

{¶1}   Plaintiff-Appellant Howard Fry appeals the February 21, 2018 judgment entry of the Guernsey County Court of Common Pleas granting summary judgment in favor of Defendants-Appellees Wheatland Tube, LLC, James Hoffman, John Parks, and Kelly Saling.

## FACTS AND PROCEDURAL HISTORY

{¶2}   Defendant-Appellee Wheatland Tube, LLC fka John Maneely Company fka Seminole Tubular is a steel tube and pipe manufacturer located in Cambridge, Ohio. Wheatland employs both male and female employees.

## Wheatland Anti-Harassment Policy

{¶3}   Wheatland provided its employees an employee handbook, which the employee was required to document he or she had received and understood its terms. As part of its employee handbook, Wheatland included an anti-harassment policy stating its commitment to maintain a work environment free from all forms of discrimination and harassment. The policy stated harassment based on sex, race, religion, age, national origin, disability, sexual orientation, or any basis prohibited by federal, state, or local law, was wrong and inappropriate behavior for the work place. The policy instructed employees on what to do if he or she felt they were harassed, including telling management. The anti-harassment policy stated that all reports of harassment would be investigated. Wheatland provided its employees anti-harassment training once a year.

## James Hoffman, Shipping Leader

{¶4}   Wheatland employed Defendant-Appellee James Hoffman as the shipper leader in the electrical shipping department. The job description of shipping leader states:

The Shipper Leader directs the activities of the Shippers. In addition, the Shipper Leader is responsible for the same working practices as assigned to the Shippers which include a complete working knowledge of plant shipping and receiving practices.

Responsibilities also include, but are not limited to:

1. Familiarity of all finished goods and their allocated stocking location.

2. Gathering in a precise and timely fashion the required items on shipping orders assigned.

3. Packing in a secure manner material designated for shipment.

4. Secure motor carriers for all shipments, selection to be based on economics and service.

5. Operate and maintain mobile equipment assigned to shipping department.

6. Filling out in an accurate and neatly manner all required shipping papers.

7. Maintains working area in a clean and orderly condition.

{¶5} As the job description states, Hoffman as shipping leader was required to do the same work in the electrical shipping department as the shippers. Hoffman was permitted to verbally tell other shippers to work, but Hoffman had no authority to discipline an employee. Hoffman was required to inform Wheatland management. Hoffman's job duties did not include hiring or terminating an employee. Hoffman could not determine an employee's wages, but Hoffman's job duty as shipping leader was to calculate a shipper's weekly incentive pay based on the amount of tonnage the shipper shipped that week from the electrical shipping department.

{¶6} Employees in the electrical shipping department and Wheatland management described Hoffman's working style as "intense." Earl Slifko, an employee in the electrical shipping department, observed Hoffman had a hard time keeping permanent employees in the department because Hoffman did not like the employee, or the employee wasn't doing what he wanted them to do.

{¶7} On February 7, 2007, Wheatland disciplined Hoffman for a violation of the Wheatland anti-harassment policy. In January 2007, Wheatland determined Hoffman behaved in an inappropriate manner with a temporary worker hired through MANCAN. Hoffman's behavior included using language and making comments that were unacceptable for the workplace, including sexual and racially related comments. The temporary employee was a biracial male. A Wheatland employee witnessed Hoffman ask the temporary employee "if it was true what he heard about you guys, that you have a big one on you." It was understood that Hoffman implied the employee had a large penis because of his race. Hoffman also told the temporary employee "the camping joke" at the encouragement of other Wheatland employees. The camping joke asked if you and a couple of your buddies go camping and the next morning, you wake up with a condom out of your butt, would you tell anybody? If the person responded no, the punchline of the joke was, do you want to go camping? The temporary employee quit and MANCAN filed a complaint with Wheatland. Defendant-Appellee Kelly Saling, general manager of operations, investigated the complaint. Hoffman admitted to telling the joke and asking if the temporary employee was biracial. Hoffman was counseled that if any other complaints were filed against him, appropriate action would be taken up to and including discharge.

**Howard Fry's Employment in the Electrical Shipping Department**

{¶8}   Wheatland hired Plaintiff-Appellant Howard Fry in January 2000 as a washer and nipple stocker. At the time of Fry's employment with Wheatland, Defendant-Appellee John Parks was the general foreman and Defendant-Appellee Kelly Saling was the general manager of operations. In April 2003, Wheatland transferred Fry to the position of shipper in the electrical shipping department.

{¶9}   Fry and Hoffman worked as a team in the electrical shipping department. They were responsible for preparing the product for shipping, which required pulling an order, getting the product, bending over to put the product on a pallet, banding the product, and wrapping the product. Wheatland management felt Hoffman and Fry worked well together and had no problems getting the orders ready for shipping in a quick and timely manner.

{¶10} Fry, however, did not feel the same about working with Hoffman. Fry claimed that during his employment in the electrical shipping department, Hoffman subjected him to years of inappropriate touching and sexual comments. Fry alleged Hoffman committed the following acts from 2004 to 2008:

- When Fry bent down to band a pallet, Hoffman grabbed his face and pulled it towards his penis. Fry heard his co-worker Earl Slifko say, "I see Jimmy's got a new bitch." Slifko denied seeing or hearing Hoffman pulling Fry's face towards his crotch. Slifko heard Hoffman say Fry was his new bitch.

- Hoffman grabbed Fry's shoulders and massaged his shoulders. Fry said John Strauss witnessed Hoffman massaging his shoulders.

- Hoffman patted Fry on the leg when Fry was doing paperwork and said, "good job."

- When Fry was bent over a pallet, the back of his pants slipped down. Hoffman grabbed Fry from behind and put his exposed penis on Fry's bare lower back/buttocks. When Fry turned around, he saw Hoffman putting his exposed penis back into his pants. Hoffman asked Fry if this was how he made his girlfriend orgasm.

- Fry saw Hoffman expose his penis to female coworkers.

- Hoffman asked a female coworker to show Fry her underwear and Hoffman pulled down the woman's pants.

- Hoffman asked Fry to go to the Lion's Den, a store selling adult merchandise, to pick out a dildo.

- Hoffman regularly grabbed Fry's breasts after Fry gained some weight.

- Hoffman put a female coworker's hand on his pants. Hoffman asked Fry to look and Fry could see Hoffman's erect penis.

- Hoffman regularly "humped" Fry by grabbing his hips and rubbing his penis against his buttocks when Fry was bent over a pallet.

- Hoffman rubbed Fry's face.

- Hoffman told Fry that he went to the Lion's Den and engaged in sexual acts with men.

- After Fry's knee surgery, Hoffman rubbed Fry's knee and said he knew how to make it feel better.

- Hoffman rubbed Fry's back prompting another employee to ask if Fry was Hoffman's lover.

{¶11} Fry felt Hoffman's behaviors were offensive and harassing. Hoffman never directly sexually propositioned or made any romantic gestures towards Fry, but Fry felt Hoffman was trying to get Fry's attention to get him to do things with Hoffman sexually. Fry stated that Hoffman never actually told him he was gay, but the way Hoffman talked about his outside activities, such as going to the Lion's Den to engage in sexual acts with men, made Fry think Hoffman was bisexual. Fry believed Hoffman identified as bisexual because Hoffman was married with children but still engaged in those behaviors towards Fry. Fry stated Hoffman was going through a divorce. Fry said to Michael Hollingshead, a coworker, that he felt Hoffman was bisexual. Fry told Slifko several times he thought Hoffman was gay because of his behavior towards Fry. James Strauss, an employee in electrical shipping, heard a rumor that Hoffman was bisexual.

{¶12} Other Wheatland employees heard Hoffman make jokes and comments of a sexual nature. Parks had heard Hoffman make inappropriate jokes. Ronald Campbell, Fry's coworker, saw Hoffman make sexual gestures towards Fry. He saw Hoffman grab his crotch in front of Fry and Hoffman come behind Fry and grab Fry's hips. He witnessed Hoffman rub Fry's head when Fry was bent down. Campbell felt Hoffman was joking but understood that some people might take offense to Hoffman's behavior.

**Fry's Complaints to Wheatland Management**

{¶13} Fry stated he complained of Hoffman's behavior multiple times to Parks, Wheatland's general foreman. In 2004, Fry complained to Parks and Parks took notes of Fry's complaints on a legal pad. Fry complained to Parks about Hoffman's lewd jokes and

unwanted touching and requested Parks to get Hoffman to stop his behavior. On February 12, 2004, Parks took notes regarding a request by Fry to be moved from the electrical shipping department because he could not work with Hoffman. Parks's notes recorded that Fry complained that Hoffman was making remarks to Fry about Fry's sex life. Fry said he would go back to work and try to get along with Hoffman. Parks's notes state he told Gary Davenport, Wheatland's business process owner. There was no evidence an investigation was made into Fry's complaint. Fry was not moved from electrical shipping.

{¶14} Fry stated he complained to Parks after the MANCAN employee quit. Fry said he told Parks they had to control Hoffman's behavior.

{¶15} In February 2007, Fry requested Parks move him to second shift so he did not have to work with Hoffman. Fry's request was prompted because Hoffman pulled Fry's face towards his crotch. Fry also states he asked Saling to move him to second shift, but he did not tell Saling his request was based on Hoffman's sexual harassment. Saling moved Fry to second shift for two weeks to train another employee.

{¶16} In August 2007, Fry said he complained to Parks that Hoffman touched his lower back/buttocks with his exposed penis. Fry said Parks told him to tuck in his shirt.

{¶17} In October or November 2007, Fry said he told Parks that Hoffman again pulled his face towards his crotch.

{¶18} In October or November 2007, Fry states he told Parks he was going to get a lawyer if Hoffman did not stop sexually harassing him.

**Fry's Termination from Wheatland**

{¶19} Wheatland had an attendance policy for its employees that was outlined in the employee handbook. An employee was subject to discipline if the employee accrued

either three occurrences in any four consecutive weeks, or five occurrences in any consecutive 12-week period. An "occurrence" was defined as leaving early, arriving late, or being absent. Occurrences were considered a "group II" violation.

{¶20} An employee's first "group II' violation could result in a verbal warning. The violation remained pending against the employee for 12 months and after 12 months, the violation expired. If the employee had an occurrence within 12 months of receiving the first-offense violation, the employee could receive a second offense, which could result in a written warning and a three-day suspension. If the employee had a third occurrence within the 12 months of the first offense, the employee could receive a five-day suspension pending discharge or termination. The employee handbook states the determination of whether to terminate the employee's employment or suspend the employee is discretionary.

{¶21} On May 9, 2007, Fry received a "group II" violation for his absence on April 10, 2007, leaving early on April 24, 2007, and being tardy on April 26, 2007. This was Fry's first offense and he received a verbal warning. Fry signed the May 9, 2007 written notice of his violation.

{¶22} On October 21, 2007, Fry received a "group II" violation for absences on August 2, 2007, August 16, 2007, September 10, 2007, September 25, 2007, and October 9, 2007. This was Fry's second offense and he received a written warning and a three-day suspension. Fry signed the October 21, 2007 written notice of his violation.

{¶23} On February 7, 2008, Fry received his third violation within a nine-month period for being tardy on November 13, 2007 and being absent on December 14, 2007, December 15, 2007, December 31, 2007, and January 28, 2008. Fry's February 7, 2008

violation placed Fry at the third offense level and Fry was subject to termination or a five-day suspension.

{¶24} On February 7, 2008, Parks and Davenport met with Fry at the end of Fry's shift. Parks informed Fry that his employment was terminated due to his third violation. Parks gave Fry written notice of the violation, but Fry refused to sign the notice and left the office. Fry called Parks later that day. Parks took notes of his conversation with Fry. Parks's notes state Fry did not contest the attendance violation, but argued another employee missed more work than Fry. Fry told Parks he was going to see a lawyer and sue for sexual harassment against Hoffman, because Parks and Davenport knew about Hoffman's behaviors. Fry also stated that he knew he would be fired since the review started. Parks told Fry the determination to terminate him was not made by Parks, but by upper management.

### Fry's Emotional Distress

{¶25} Fry stated he suffered emotional distress as a result of Hoffman's harassment and his termination. During Fry's employment, Fry suffered a workplace accident and sustained a severe injury to his knee that required an extended leave due to his injuries. The doctor treating Fry's knee prescribed Fry sleeping medication. Fry states he told the doctor that he could not sleep due to the sexual harassment he was suffering at work, but Fry's medical records do not reflect that statement. During Fry's employment he did not seek mental health treatment. After he sought legal assistance, Fry was seen by a psychologist. It was determined Fry suffered from symptoms of anxiety and depression due to Hoffman's sexual harassment and Fry's termination. Fry could not secure employment after his termination.

**Fry's Employment Discrimination Complaint**

{¶26} On July 21, 2008, Fry filed an employment discrimination complaint against Defendants-Appellees Wheatland, Hoffman, Parks, and Saling (hereinafter "Wheatland") in the Guernsey County Court of Common Pleas. Fry alleged claims of hostile work environment sexual harassment, negligent retention and supervision, retaliation, and intentional infliction of emotional distress. After discovery, Wheatland moved for summary judgment on all of Fry's claims. On October 28, 2009, the trial court issued its judgment entry denying Wheatland's motion for summary judgment. On September 14, 2015, Fry voluntarily dismissed his complaint without prejudice.

{¶27} Fry refiled his complaint on September 13, 2016, alleging the same claims against Wheatland. A new trial court judge had been elected to the Guernsey County Court of Common Pleas. Wheatland renewed its motion for summary judgment based on the discovery from the original action. On February 21, 2018, the trial court granted summary judgment in favor of Wheatland.

{¶28} It is from this judgment Fry now appeals.

**ASSIGNMENTS OF ERROR**

{¶29} Fry raises five Assignments of Error:

{¶30} "I. THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT DEFENDANT JAMES HOFFMAN WAS NOT PLAINTIFF'S SUPERVISOR, AS DEFENDANT WHEATLAND TUBE LLC VESTED JAMES HOFFMAN WITH SUPERVISORY AUTHORITY.

{¶31} "II. THE TRIAL COURT ERRED, AS A MATTER OF LAW, IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN

SUPPORT, AS IT RELATES TO PLAINTIFF'S CLAIM OF SEXUAL HARASSMENT-HOSTILE WORK ENVIRONMENT.

{¶32} "III. THE TRIAL COURT ERRED, AS A MATTER OF LAW, IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT, AS IT RELATES TO PLAINTIFF'S CLAIM OF RETALIATION AND WRONGFUL DISCHARGE.

{¶33} "IV. THE TRIAL COURT ERRED, AS A MATTER OF LAW, IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT, AS IT RELATES TO PLAINTIFF'S CLAIM OF NEGLIGENT RETENTION AND SUPERVISION.

{¶34} "V. THE TRIAL COURT ERRED, AS A MATTER OF LAW, IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT, AS IT RELATES TO PLAINTIFF'S CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS."

## ANALYSIS

### Standard of Review

{¶35} Fry argues the trial court erred when it granted Wheatland's motion for summary judgment. We refer to Civ.R. 56(C) in reviewing a motion for summary judgment which provides, in pertinent part:

Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law. * *
* A summary judgment shall not be rendered unless it appears from such
evidence or stipulation and only from the evidence or stipulation, that
reasonable minds can come to but one conclusion and that conclusion is
adverse to the party against whom the motion for summary judgment is
made, such party being entitled to have the evidence or stipulation
construed most strongly in the party's favor.

{¶36} The moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court, which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. *Dresher v. Burt,* 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). The nonmoving party then has a reciprocal burden of specificity and cannot rest on the allegations or denials in the pleadings, but must set forth "specific facts" by the means listed in Civ.R. 56(C) showing that a "triable issue of fact" exists. *Mitseff v. Wheeler,* 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801 (1988).

{¶37} Pursuant to the above rule, a trial court may not enter summary judgment if it appears a material fact is genuinely disputed. *Vahila v. Hall,* 77 Ohio St.3d 421, 429, 674 N.E.2d 1164 (1997), citing *Dresher v. Burt,* 75 Ohio St.3d 280, 662 N.E.2d 264 (1996).

{¶38} As an appellate court reviewing summary judgment motions, we must stand in the shoes of the trial court and review summary judgments on the same standard and evidence as the trial court. *Smiddy v. The Wedding Party, Inc.,* 30 Ohio St.3d 35, 506 N.E.2d 212 (1987).

**I. Was Hoffman Fry's Supervisor?**

{¶39} Fry argues in his first Assignment of Error that the trial court erred when it found reasonable minds could only conclude that Hoffman was not Fry's supervisor. We disagree.

{¶40} Fry brought claims of hostile work environment sexual harassment pursuant to Chapter R.C. 4112 against Wheatland, the corporation, and Hoffman, individually. R.C. 4112.02(A) states that it is an unlawful discriminatory practice "[f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.01(A)(2) defines "employer" as "any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer."

{¶41} The issue of whether Hoffman was Fry's supervisor is first relevant to the issue of whether Hoffman is individually liable if his conduct was found to be discriminatory under R.C. Chapter 4112. The Ohio Supreme Court held in *Genaro v. Cent. Transp., Inc.*, 84 Ohio St.3d 293, 703 N.E.2d 782, syll. ¶1 (1999), that supervisors and managers may be held personally liable for unlawful discriminatory acts committed by such persons in violation of R.C. Chapter 4112.

{¶42} The determination of whether Hoffman was Fry's supervisor is also relevant to the determination of whether Fry established the elements of a hostile work environment sexual harassment claim. A plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination "because of * * * sex" by proving either of two

types of sexual harassment: (1) "*quid pro quo* " harassment, *i.e.,* harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) "hostile environment" harassment, *i.e.,* harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 2000-Ohio-128, 729 N.E.2d 726, paragraph one of syllabus.

{¶43} In order to establish a claim of hostile work environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Id*. at paragraph two of syllabus. Accordingly, the fourth element of *Hampel* requires Fry to establish one of two things, (1) his supervisor committed the harassment; or (2) that Wheatland knew or should have known about the harassment and failed to take corrective action.

{¶44} The Ohio Supreme Court has not defined "supervisor" for the purposes of Chapter 4112 liability. *Holland v. Mercy Health*, 2018 IER Cases 427186, 2018 WL 6041359, *8 (N.D.Ohio Nov. 19, 2018). Federal cases applying Title VII are generally applicable to cases involving R.C. Chapter 4112. *Genaro, supra*. Federal district courts within the Sixth Circuit interpreting Title VII have relied on *Vance v. Ball State Univ.*, 570 U.S. 421, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013) – which defines a "supervisor" for

purposes of Title VII harassment claims – "to determine whether an individual constituted a supervisor[.]" *Id.* quoting *Ault v. Oberlin Coll.*, 2014 WL 4245991, *12 (N.D. Ohio 2014) (Vecchiarelli, J.), *aff'd in part and rev'd in part on other grounds*, 620 F.Appx. 395 (6th Cir. 2015).

{¶45} Under *Vance, supra*, 570 U.S. at 424, 431, 133 S.Ct. 2434, a "supervisor" is "empowered by the employer to take tangible employment actions against the victim," which means "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Holland v. Mercy Health*, 2018 IER Cases 427186, 2018 WL 6041359, *8 (N.D.Ohio Nov. 19, 2018).

{¶46} Reviewing the Civ.R. 56 evidence in a light most favorable to Fry shows there is no genuine issue of material fact that Hoffman was not Fry's supervisor. Davenport, Parks, and Saling stated Hoffman was not Fry's supervisor. (Davenport Depo. 65, Park Depo. 56, Saling Depo. 49). The job description of shipping leader states:

> The Shipper Leader directs the activities of the Shippers. In addition, the
>
> Shipper Leader is responsible for the same working practices as assigned
>
> to the Shippers which include a complete working knowledge of plant
>
> shipping and receiving practices.
>
> Responsibilities also include, but are not limited to:
>
> 1. Familiarity of all finished goods and their allocated stocking location.
>
> 2. Gathering in a precise and timely fashion the required items on shipping
>
> orders assigned.
>
> 3. Packing in a secure manner material designated for shipment.

4. Secure motor carriers for all shipments, selection to be based on economics and service.

5. Operate and maintain mobile equipment assigned to shipping department.

6. Filling out in an accurate and neatly manner all required shipping papers.

7. Maintains working area in a clean and orderly condition.

{¶47} Wheatland's job description for shipping leader did not empower Hoffman to take a tangible employment action against Fry. Hoffman could not fire, demote, promote, or transfer Fry. Fry testified in his deposition that Hoffman could not discipline him, but Hoffman could go to general foreman to have Fry disciplined. (Fry Depo. 228). Hoffman could not give Fry a written warning, suspend him, or terminate his employment. (Fry Depo. 228). Hoffman could not change Fry's work schedule without asking the general foreman. (Fry Depo. 228-229). A coworker's ability to initiate the disciplinary process and recommend demotion or promotion does not demonstrate in all cases that "the employer has effectively delegated the power to take tangible employment actions to the employees on whose recommendation it relies." *EEOC, supra*, 2017 WL 2506526, \*\*3 quoting *Vance*, 133 S.Ct. at 2452. There was no Civ.R. 56 evidence presented that Parks or Saling were required to follow Hoffman's recommendations as to discipline. *Hylko v. Hemphill*, 698 Fed.Appx. 298, 299, 2017 WL 4390419 (6th Cir.2017).

{¶48} Hoffman could not set Fry's salary, but Hoffman was responsible for calculating the incentive pay in the electrical shipping department. The incentive pay for the shippers was a percentage of the amount of tonnage shipped from the electrical shipping department. (Fry Depo. 189). The maximum rate was 120%. (Fry Depo. 188).

Hoffman did not have authority to go over the maximum rate. (Fry Depo. 188). There was no Civ.R. 56 evidence presented that Hoffman could use his discretion to calculate the incentive pay.

{¶49} Hoffman's ability to direct Fry's work in the electrical shipping department and his title as "Shipping Leader" did not make him Fry's supervisor for purposes of Title VII. *EEOC v. AutoZone, Inc.,* 692 Fed.Appx. 280, 283, 2017 WL 2506526, (6th Cir.2017) citing *Vance*, 133 S.Ct. at 2443. The evidence shows Hoffman was not authorized to effect a significant change in Fry's employment status and was therefore not Fry's supervisor pursuant to *Vance, supra*.

{¶50} Fry's first Assignment of Error is overruled.

## II. Hostile Work Environment Sexual Harassment

{¶51} Fry argues in his second Assignment of Error that the trial court erred when it found there was no genuine issues of material fact that Wheatland was not liable under R.C. 4112.02 for hostile work environment sexual harassment. We agree.

{¶52} R.C. 4112.02(A) states that it is an unlawful discriminatory practice "[f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." A plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination "because of * * * sex" by proving either of two types of sexual harassment: (1) "*quid pro quo*" harassment, *i.e.,* harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) "hostile environment" harassment, *i.e.,* harassment

that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 2000-Ohio-128, 729 N.E.2d 726, paragraph one of syllabus.

{¶53} A hostile work environment exists whenever "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295. Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment" does not violate Title VII. *Id.*

{¶54} Fry claims he was subjected to a hostile work environment because of Hoffman's sexual harassment. In order to establish a claim of hostile work environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Id.* at paragraph two of syllabus. We determined in Fry's first Assignment of Error that Hoffman was not Fry's supervisor; therefore, Fry must show that Wheatland knew or should have known of the conduct and failed to take prompt and appropriate corrective action.

### A. The Harassment was Unwelcome & Fry Reported the Harassment

{¶55} In its appellate brief, Wheatland states that it assumes for summary judgment purposes that Hoffman's alleged behaviors were unwelcomed by Fry and Fry reported the alleged harassment to Wheatland.

{¶56} Reviewing the Civ.R. 56 evidence in this case in a light most favorable to Fry, we find reasonable minds could only conclude that Hoffman's sexual comments and touching were unwelcome to Fry.

{¶57} Further, there is no genuine issue of material fact that on February 12, 2004, Fry reported to Parks that Hoffman was asking him questions about his sex life and Hoffman's comments were unwelcome. Fry testified that he complained to Parks about Hoffman's behavior multiple times.

## B. Because of Sex – The Causation Element

{¶58} Fry is alleging same-sex harassment by his co-worker. Sexual harassment is defined by federal EEOC regulations as unwelcome sexual advances, requests for sexual favors, and other verbal harassment or physical harassment of a sexual nature. 29 C.F.R. 1604.11.

{¶59} The Ohio Supreme Court has held that R.C. 4112.02(A) protects men as well as women from all forms of sex discrimination in the workplace, including discrimination consisting of same-sex sexual harassment. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726 (2000). Additionally, the United States Supreme Court has construed Title VII to allow hostile work environment claims where the harasser and the victim are of the same sex. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); see also U.S. Equal Employment                Opportunity                Commission,                *Sexual                Harassment,*

http://www.eeoc.gov/laws/types/sexual_harassment.cfm (accessed March 27, 2019) (stating "both victim and the harasser can be either a woman or a man, and the victim and harasser can be the same sex").

{¶60} An essential element in a hostile work environment sexual harassment claim, regardless of whether the harasser and the victim are the opposite or the same sex, is whether the plaintiff was targeted for harassment because of his or her sex. *Id.*

{¶61} Both the United States Supreme Court and the Ohio Supreme Court have suggested three evidentiary routes to prove conduct is "because of sex" in same-sex cases: (1) evidence that the harasser is homosexual and the harassment is motivated by sexual desire; (2) evidence that the harasser is motivated by a hostility to the presence of the victim's gender in the workplace; or (3) evidence that the harasser treated males and females differently in a mixed-gender workplace. *Persichillo v. Motor Carrier Serv., Inc.*, 156 Ohio App.3d 383, 2004-Ohio-1042, 806 N.E.2d 181 (6th Dist.), ¶ 17 quoting *Oncale v. Sundowner Offshore Serv.*, 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726 (2000).

{¶62} Wheatland contends Fry cannot establish that Hoffman's conduct was "because of sex" because Hoffman was in a long-standing marriage with children at the time he was working with Fry, and because Hoffman never asked Fry to do anything with him sexually.

{¶63} While Hoffman and Fry testified Hoffman was married with children at the time of the conduct, Fry testified that the way Hoffman talked about his outside activities, such as going to the Lion's Den and engaging in sexual acts with men, made Fry think

Hoffman was bisexual. Fry told Hollingshead he felt Hoffman was bisexual and told Slifko several times he thought Hoffman was gay because of his behavior towards Fry. Strauss heard a rumor that Hoffman was bisexual. As such, a genuine issue of fact remains on this issue for a jury to decide.

{¶64} Additionally, though Hoffman never directly sexually propositioned Fry, Fry felt Hoffman was trying to get Fry's attention to get him to do things with Hoffman sexually. The Ohio Supreme Court has held that the "harasser's words and conduct themselves may sometimes suffice to raise the inference of homosexuality or sexual desire circumstantially." *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726 (2000). Fry's testimony regarding multiple instances of physical touching and sexual comments over a four-year period are sufficient to establish a genuine issue of material fact as to whether Hoffman's conduct is "because of sex."

{¶65} Wheatland also contends because Hoffman engaged in offensive behavior with both his male and female coworkers, Hoffman's conduct cannot be found to be "because of" Fry's sex. Considering the totality of the circumstances, we conclude a question of fact remains whether Hoffman treated Fry the way he did because of Fry's sex, or whether Hoffman subjected all employees to sexual comments and touching, regardless of gender. Based on the evidence Fry relies on, a reasonable finder of fact could determine Hoffman would not have harassed Fry but for his sex. See *Camp v. Star Leasing Co.*, 10th Dist. Franklin No. 11AP-977, 2012-Ohio-3650.

{¶66} We emphasize that this case comes before this Court on a judgment entry granting summary judgment. We recognize that factual disputes remain as to the

credibility of witnesses and whether or how certain events took place. However, summary judgment is not the vehicle for weighing the evidence or determining witness credibility.

### C. Severe & Pervasive

{¶67} The third requirement for a claim of hostile work environment is that the harassing conduct be sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726 (2000).

{¶68}      In order to be actionable, a hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Gatsios v. Timken Co.*, 5th Dist. Stark No. 2011CA00185, 2012-Ohio-2875.   The severe and pervasive requirement "filters out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.*

{¶69} In determining whether the conduct complained of is sufficiently severe or pervasive to constitute a hostile or abusive work environment, courts must "view the work environment as a whole and consider the totality of all facts and circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment." *Hampel v. Food Ingredients Specialties, Inc.,* 89 Ohio St.3d 169, 729 N.E.2d 726 (2000).   This determination is fact-specific.  *Id.*  While no single factor is required, circumstances to consider may include the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely an offensive utterance,

whether the conduct unreasonably interferes with an employee's work performance, and whether psychological harm results. *Id.* The work environment must be viewed as a whole, "keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes." *Id.* Accordingly, "even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Id.*

{¶70} In this case, based on Fry's testimony, it is clear that Hoffman's sexual comments and touching were subjectively offensive to Fry.

{¶71} Based on the totality of the circumstances, we find there is a genuine issue of material fact as to whether the alleged harassing conduct was objectively severe or pervasive and whether a reasonable person would find Wheatland was a hostile and abusive place to work. Fry has put forth evidence that the conduct was frequent and severe, over a four-year period of time, and included both sexual comments and multiple instances of physical touching.

{¶72} Wheatland argues that Hoffman's behavior did not affect the terms and conditions of Fry's employment, as Fry and Hoffman were an effective team. However, Fry testified that he and Hoffman worked "really, really good together, *when he was not sexually harassing me.*" (Emphasis added). Fry asked Parks to be moved from the electrical shipping department because he could not work with Hoffman due to Hoffman's sexually related remarks. Fry requested to be moved to second shift so he did not have

to work with Hoffman. Fry testified that, as a result of Hoffman's behaviors and Wheatland's inaction, he suffered anxiety, depression, nightmares, and insomnia.

{¶73} We find Fry presented sufficient evidence from which reasonable minds could conclude, when considering the totality of all the facts and surrounding circumstances, that the alleged harassing conduct in this case was sufficiently severe or pervasive to affect the conditions of Fry's employment.

### D. Knew or Should Have Known

{¶74} The final prong of the hostile-work-environment test is whether the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action. Courts have interpreted the "should have known" standard in cases of co-worker harassment and stated the employer "can be liable only if its response manifests an indifference or unreasonableness in light of the facts the employer knew or should have known." *Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App.3d 722, 2005-Ohio-4978, 840 N.E.2d 236 (8th Dist.). Fry testified he reported the harassment to Parks multiple times. There is no evidence an investigation was made into Fry's complaints. Fry was not moved from the electrical shipping department.

{¶75} Based on the foregoing, we find Fry has established all the prongs necessary to create a genuine issue of material fact concerning the existence of a hostile work environment. Accordingly, the trial court erred in granting summary judgment. Fry's second Assignment of Error is sustained.

### III. Retaliation and Wrongful Discharge

{¶76} Fry contends in his third Assignment of Error that the trial court erred when it found there was no genuine issue of material fact that Wheatland properly terminated Fry's employment pursuant to the terms of Wheatland's attendance policy.

{¶77} An employer may not retaliate against an employee who has opposed an unlawful discriminatory practice, or who has "made a charge * * * under R.C. 411.01 through 4112.07." *Boggs v. The Scotts Co.*, 10th Dist. Franklin No. 04AP-425, 2005-Ohio-1264, ¶ 23 quoting *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 727, 729 N.E.2d 813 (10th Dist.1999). A prima facie case of retaliation is established by showing: 1) the plaintiff engaged in a protected activity; 2) the defendant knew plaintiff engaged in this activity; 3) the defendant took an employment action adverse to the plaintiff; and, 4) there was a causal connection between the protected activity and the adverse employment action. *Waters v. Allied Machine & Eng. Corp.*, 5th Dist. Tuscarawas No. 02AP040032, 2003-Ohio-2293, 2003 WL 21027180, ¶ 100 citing *Baker v. The Buschman Co.* (1998), 127 Ohio App.3d 561, 567-568, 713 N.E.2d 487.

{¶78} If Fry is able to establish a prima facie case of retaliation, the burden shifts to Wheatland to articulate a legitimate reason for its action. *Id*. If Wheatland does so, the burden then shifts back to Fry to demonstrate that the proffered reason was a pretext. *Id*. Even if Fry is able to establish a prima facie case of retaliation, he cannot prevail if the evidence demonstrates that Wheatland would have made the same decision regardless of whether he participated in a protected activity. *Boggs v. The Scotts Co.*, 10th Dist. Franklin No. 04AP-425, 2005-Ohio-1264, 2005 WL 647560, ¶ 23 citing *Goad v. Sterling*

*Commerce, Inc.* (June 13, 2000), Franklin App. No. 99AP-321, quoting *Neal v. Hamilton Cty.* (1993), 87 Ohio App.3d 670, 678, 622 N.E.2d 1130.

{¶79} Fry contends that Wheatland enforced its attendance policy shortly after Fry complained to Parks in October or November 2007 that if Hoffman did not stop harassing him, he was going to get an attorney. (Fry Depo. 217). Fry said he made this statement to Parks while they were standing in a hallway. Parks said he would speak with Hoffman. Fry did not see Parks take notes of the statement. In February 2008, Fry's employment was terminated due to excessive absenteeism. Parks testified Fry indicated he was going to contact an attorney after Fry was terminated. (Parks Depo. 72).

{¶80} Wheatland contends Fry cannot establish a prima facie case of retaliation even assuming Fry engaged in protected activity because there is no causal connection between Fry's complaint of alleged sexual harassment and his termination. Wheatland argues the Civ.R. 56 evidence demonstrates Wheatland terminated Fry's employment due to Fry's violation of Wheatland's attendance policy.

{¶81} Upon our review of the evidence, we agree that Fry was terminated pursuant to the terms of Wheatland's attendance policy. Wheatland had an attendance policy for its employees that was outlined in the employee handbook. An employee was subject to discipline if the employee accrued either three occurrences in any four consecutive weeks, or five occurrences in any consecutive 12-week period. An "occurrence" was defined as leaving early, arriving late, or being absent. Occurrences were considered a "group II" violation.

{¶82} An employee's first "group II' violation could result in a verbal warning. The violation remains pending against the employee for 12 months and after 12 months, the

violation expires. If the employee has an occurrence within 12 months of receiving the first-offense violation, the employee could receive a second offense, which could result in a written warning and a three-day suspension. If the employee has a third occurrence within the 12 months of the first offense, the employee could receive a five-day suspension pending discharge or termination. The employee handbook states the determination of whether to terminate the employee's employment or suspend the employee is discretionary.

{¶83} On May 9, 2007, Fry received a "group II" violation for his absence on April 10, 2007, leaving early on April 24, 2007, and being tardy on April 26, 2007. This was Fry's first offense and he received a verbal warning. Fry signed the May 9, 2007 written notice of his violation.

{¶84} On October 21, 2007, Fry received a "group II" violation for absences on August 2, 2007, August 16, 2007, September 10, 2007, September 25, 2007, and October 9, 2007. This was Fry's second offense and he received a written warning and a three-day suspension. Fry signed the October 21, 2007 written notice of his violation.

{¶85} On February 7, 2008, Fry received his third violation within a nine-month period for being tardy on November 13, 2007 and being absent on December 14, 2007, December 15, 2007, December 31, 2007, and January 28, 2008. Fry's February 7, 2008 violation placed Fry at the third offense level and Fry was subject to termination or a five-day suspension.

{¶86} Temporal proximity of Fry's complaint and his termination alone does not support a claim of retaliation if there is no other compelling evidence. *Boggs v. The Scotts Co.*, 10th Dist. Franklin No. 04AP-425, 2005-Ohio-1264, 2005 WL 647560, ¶ 26 citing

*Aycox v. Columbus Bd. of Edn.,* Franklin App. No. 03AP-1285, 2005-Ohio-69, ¶ 20. Fry argues that other similarly-situated employees were not terminated due to excessive absenteeism, but instead Wheatland suspended the employees. Wheatland provided Civ.R. 56 evidence to demonstrate the other employees' attendance violations were not comparable to Fry's attendance violations. Further, the Wheatland attendance policy permitted Wheatland to exercise discretion in its decision to enforce a suspension or termination due to a violation of its attendance policy. Fry received the employee handbook and was notified of the attendance policy.

{¶87} We find that Fry failed to raise a genuine issue of material fact as to wrongful discharge and retaliation. His third Assignment of Error is overruled.

### IV. Negligent Retention and/or Supervision

{¶88} In Fry's fourth Assignment of Error, Fry contends he demonstrated there was a genuine issue of material fact for trial that Wheatland negligently retained and supervised Hoffman. We agree.

{¶89} The elements of a negligent retention/supervision claim are: (1) an employment relationship; (2) incompetence of the employee; (3) actual or constructive knowledge of the incompetence by the employer; (4) an act or omission by the employee which caused the plaintiff's injuries; and (5) negligent retention of the employee by the employer, which action is the proximate cause of the plaintiff's injuries. *Zieber v. Heffelfinger*, 5th Dist. Richland No. 08CA0042, 2009-Ohio-1227.

{¶90} It is undisputed that Hoffman, the alleged harasser, was an employee of Wheatland. As to whether Wheatland had actual or constructive knowledge, there is no genuine issue of material fact that on February 12, 2004, Fry reported to Parks that

Hoffman was asking Frye questions about his sex life and Hoffman's comments were unwelcome.  Fry stated he complained to Parks about Hoffman's behavior multiple times.

{¶91} In the negligent retention context, incompetence "relates not only or exclusively to an employee's lack of ability to perform the tasks that his or her job involves," but it also relates to "behavior while on the job inapposite to the tasks that a job involves and which materially inhibits other employees from performing their assigned job tasks.  Sexually harassing behavior is within that definition." *Harmon v. GZK, Inc.*, 2nd Dist. Montgomery No. 18672, 2002 WL 191598 (Feb. 8, 2002); *Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App.3d 722, 2005-Ohio-4978, 840 N.E.2d 236 (8th Dist.). Fry testified he and Hoffman worked well together "when he [Hoffman] was not sexually harassing me."  Fry requested to be moved from the electrical shipping department because he could not work with Hoffman and requested to be moved to second shift so he did not have to work with Hoffman.  Additionally, as detailed above, Fry has presented sufficient evidence to create an issue of material fact concerning the alleged sexual harassment and therefore the alleged incompetence.

{¶92} The fourth element requires an act that caused Fry's injuries and the failure of Wheatland to remedy the situation.  Fry's testimony that he suffers from anxiety, depression, nightmares, insomnia, and sexual dysfunction, and the report by the psychologist that Fry suffered from symptoms of anxiety and depression due to Hoffman's sexual harassment provides sufficient evidence to create an issue of material fact concerning whether Hoffman's conduct caused Fry injury.  Fry's testimony about his multiple complaints to Parks and requests to either move out of the department or to

another shift creates a genuine issue of material fact as to whether Wheatland failed to appropriately discipline Hoffman or otherwise remedy the situation.

{¶93} The fifth prong of the test requires retention of the employee, which is the proximate cause of Fry's injuries. If Wheatland had prior knowledge of Hoffman's incompetence, that is, his subjecting Fry to sexual harassment, and "despite this knowledge failed to intervene to prevent a recurrence of the behavior in the workplace, then the employer would be guilty of negligent retention." *Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App.3d 722, 2005-Ohio-4978, 840 N.E.2d 236 (8th Dist.). Fry's testimony that he complained to Parks multiple times about Hoffman's behavior and that Parks failed to move him out of the electrical shipping department or to another shift despite his requests provides sufficient evidence to raise an issue of material fact.

{¶94} The evidence, viewed in a light most favorable to Fry, demonstrates he presented sufficient evidence for purposes of Civil Rule 56 regarding each element of a claim for negligent supervision and retention.

{¶95} Fry's fourth Assignment of Error is sustained.

### V. Intentional Infliction of Emotional Distress

{¶96} Fry finally contends in his fifth Assignment of Error that the trial court erred when it found Wheatland was entitled to judgment as a matter of law on Fry's claim for intentional infliction of emotional distress. The trial court found Fry was unable to meet his burden to establish that Hoffman intended to cause harm to Fry or that Hoffman's behavior was so extreme and outrageous it shocked the conscious of the community.

{¶97} A successful intentional infliction of emotional distress claim requires a plaintiff to prove: (1) the defendant intentionally or recklessly caused the plaintiff serious

emotional distress; (2) the defendant's conduct was "extreme and outrageous"; and (3) the defendant's conduct proximately caused the plaintiff serious emotional distress. *White v. Bhatt*, 5th Dist. No. 17CA30, 2017-Ohio-9277, 102 N.E.3d 607, 2017 WL 6618857, ¶ 36, *appeal not allowed,* 152 Ohio St.3d 1479, 2018-Ohio-1990, 98 N.E.3d 294, 2018 WL 2357186, ¶ 36 (2018) citing *Phung v. Waste Mgmt., Inc.* (1994), 71 Ohio St.3d 408, 410, 644 N.E.2d 286; *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 453 N.E.2d 666, syllabus.

{¶98} In other words, to prove a claim of intentional infliction of emotional distress, the plaintiff must show that the defendant intentionally or recklessly caused him serious emotional distress by extreme and outrageous conduct." *Mills v. Sonoco Phoenix*, 5th Dist. Stark No. 2013 CA 00067, 2014-Ohio-366, 2014 WL 463208, ¶ 22 citing *Stafford v. Columbus Bonding Ctr.,* 177 Ohio App.3d 799, 809, 2008–Ohio–3948, 896 N.E.2d 191 (10th Dist.), citing *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666 (1983).

{¶99} "[I]n order to state a claim alleging the intentional infliction of emotional distress, the emotional distress alleged must be serious." "[S]erious emotional distress" is "emotional injury which is both severe and debilitating." "[S]erious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." (Citations omitted). *Smith v. Redecker,* 4th Dist. No. 08CA33, 2010–Ohio–505, at ¶ 60.

{¶100}     Additionally, "[e]xpert medical testimony is not indispensable to a claim of serious emotional distress. * * * More particularly, as an alternative and in lieu of expert testimony, a plaintiff may submit the testimony of lay witnesses who are acquainted with the plaintiff as to any 'marked changes in the emotional or habitual makeup' of the

plaintiff following a defendant's allegedly culpable conduct." *Powell v. Grant Med. Ctr.* (2002), 148 Ohio App.3d 1, 6, 771 N.E.2d 874 (citations omitted).

{¶101}    Though liability does not extend to mere insults, indignities, threats, annoyances, or other trivialities, Fry stated Hoffman subjected him to daily offensive comments and repeated physical touching over a four-year period. Fry complained to Wheatland regarding Hoffman's behaviors to no avail. As a result of Hoffman's behaviors and Wheatland's inaction, Fry complains he suffers from emotional distress in the form of anxiety, depression, nightmares, insomnia, and sexual dysfunction.

{¶102}    Reviewing the Civil Rule 56 evidence in this case in a light most favorable to Fry, we find there is a genuine issues of material fact as to the elements of an intentional infliction of emotional distress claim, specifically, whether Hoffman's conduct was so extreme and outrageous as to go beyond all possible bounds of human decency, and whether the conduct proximately caused Fry serious emotional distress.

{¶103}    Fry's fifth Assignment of Error is sustained.

**CONCLUSION**

{¶104}       Based on the foregoing, Fry's assignments of error are sustained in part and overruled in part.  Fry's first and third assignments of error are overruled.  Fry's second, fourth, and fifth assignments of error are sustained.  The February 21, 2018 judgment entry of the Guernsey County Court of Common Pleas is affirmed in part, and reversed and remanded in part, for proceedings consistent with this opinion.

By:  Gwin, P.J. and

Wise, Earle, J., concur;

Delaney, J., dissents.

*Delaney, J., dissenting.*

{¶1}   I concur with the majority's disposition of Fry's first and third Assignments of Error, but disagree in the disposition of second, fourth, and fifth Assignments of Error, and therefore would affirm the decision of the trial court.

{¶2}   In regards to the second Assignment of Error, an essential element in a hostile work environment sexual harassment claim, regardless of whether the harasser and victim are the opposite or the same sex, is whether the plaintiff was targeted for harassment *because of the plaintiff's sex*. (Emphasis added.) "Since the conduct complained of in many of these sexual harassment cases is so offensive, it is easy to understand that a sense of decency initially inclines one to want to grant relief. It is easy to forget, however, that Title VII deals with discrimination in the workplace, not morality or vulgarity." *E.E.O.C. v. Harbert-Yeargin, Inc.* 266 F.3d 498, 519 (6th Cir.2001). The United States Supreme Court has explained that a claim of sexual harassment does not lie "merely because the words used have sexual content or connotations." *Rayford v. Illinois Cent. R.R.*, 489 Fed. Appx. 1, 2012 WL 2755844, ** 3 (6th Cir.2012) quoting *Oncale*, 523 U.S. at 80. Rather, "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.*

{¶3}   In same-sex cases, the United States Supreme Court has suggested three evidentiary routes to prove conduct is because of sex: (1) evidence that the harasser is homosexual and the harassment is motivated by sexual desire; (2) evidence that the harasser is motivated by a hostility to the presence of the victim's gender in the workplace; or (3) evidence that the harasser treated males and females differently in a mixed-gender

workplace. *Persichillo v. Motor Carrier Serv., Inc.*, 156 Ohio App.3d 383, 2004-Ohio-1042, 806 N.E.2d 181 (6th Dist.), ¶ 17 quoting *Oncale v. Sundowner Offshore Serv.*, 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

{¶4}   To establish the causation element that Hoffman's conduct was because of sex, Fry's sole argument is that Hoffman identified as a homosexual and his harassment of Fry was motivated by Hoffman's sexual desire for Fry. Upon review of the record, I disagree there are factual issues as to whether Hoffman's actions towards Fry were motivated by Hoffman's sexual desire for Fry.

{¶5}   At the time of the Hoffman was working with Fry, Hoffman was in a long-time marriage with children. While Hoffman was allegedly harassing Fry, Fry stated Hoffman told him he was going through a divorce. Fry felt sorry for Hoffman because he talked about his wife a lot and he obviously loved her. (Fry Depo. 62).

{¶6}   Fry testified Hoffman never asked him to do anything with him sexually. (Fry Depo. 64). Fry did not allege that Hoffman directly propositioned him or made any romantic gestures towards him.

{¶7}   The Civ.R. 56 evidence demonstrates Hoffman engaged in offensive and vulgar behavior with both his male and female coworkers at Wheatland. Ronald Campbell testified Hoffman would tell his coworkers all types of jokes, and a lot of people did not find them funny, including Fry. (Campbell Depo. 26). Campbell saw Hoffman joking in a sexual way with his female coworkers. (Campbell Depo. 51-52). Fry testified that Hoffman would often pretend to open the zipper of his pants and say, "Do you want some of this?" to both men and women in the workplace. (Fry Depo. 201-203). Hoffman asked a female coworker to show Fry her underwear, which she did. (Fry Depo. 131-132). Fry witnessed

Hoffman put his female coworker's hand on the crotch of his pants and saw Hoffman get an erection. (Fry Depo. 71). At the encouragement of his coworkers, Hoffman told the male MANCAN employee the "camping joke." (Fry Depo. 147). When asked if Hoffman had done anything to him that he thought was inappropriate or sexual in nature, Campbell answered, "About the same thing he does to everybody else, you know, he's just joking around. Like I say, we – some of us just ignore it. Some of – he's – like two people think two different things. One is good and one is bad. You know, somebody – somebody there takes offense to it, others just laugh it off as a joke. You know, it's just two people, different things." (Campbell Depo. 36).

{¶8} The Civ.R. 56 evidence does not support Fry's argument there is a genuine issue of material fact that Hoffman identified as a homosexual and he was motivated to harass Fry based on his sexual desire for Fry. The evidence demonstrates that Hoffman engaged in offensive behavior with both his male and female coworkers. A work "environment which is equally harsh for both men and women * * * does not constitute a hostile working environment under the civil rights statutes." *Messer v. Summa Health Sys.*, 9th Dist. No. 28470, 2018-Ohio-372, 105 N.E.3d 550, ¶ 42, *appeal not allowed,* 153 Ohio St.3d 1453, 2018-Ohio-3026, 103 N.E.3d 832, 2018 WL 3649994, ¶ 42 (2018) citing *Brennan v. Metro. Opera Assn.* 192 F.3d 310, 318 (2d Cir.1999).

{¶9} No one denies that Hoffman's behavior towards Fry was repulsive. Nor do I lightly wave away Hoffman's behavior as innocent "horseplay" or simply that "boys will be boys." It has been discussed that the reality of sexual harassment is based on power, not on sexual attraction. Zalesne, Deborah, "When Men Harass Men: Is it Sexual Harassment?" (1998). *CUNY Academic Works.* Sexual harassment implicates and

exploits a power imbalance. *Id.* However, the current law as to a civil rights action based on sexual harassment does not discuss the question of power vs. sex or the evolving meaning of the word "sex." We are constrained by the language of Title VII and R.C. Chapter 4112.02 and the precedential legal interpretations of the same. The issue in this case is whether Hoffman's behaviors constituted discrimination based on sex, not conduct merely tinged with offensive sexual connotations. Were members of one sex exposed to disadvantageous terms or conditions of employment to which members of the other sex were not exposed? *Oncale*, 523 U.S. 80. Under the facts of this case, there is no genuine issue of material fact that Hoffman's behaviors did not constitute discrimination because of sex. Accordingly, Fry failed to meet his *Dresher* burden of establishing the existence of a genuine issue of material fact as to the essential condition of a sexual harassment case, i.e., "[h]arassment 'because of * * * sex.' " *See Hampel*, 89 Ohio St.3d at 178, 729 N.E.2d 726. The trial court did not err in granting summary judgment as to the sexual harassment claim.

{¶10} In light of my analysis of the second element of a sexual harassment claim, I would find the parties' arguments as to the other elements are moot. *See* App.R. 12(A)(1)(c); *Messer v. Summa Health Sys.*, 9th Dist. No. 28470, 2018-Ohio-372, 105 N.E.3d 550, 2018 Fair Empl.Prac.Cas. (BNA) 31521, 2018 WL 650805, ¶¶ 44-45, *appeal not allowed,* 153 Ohio St.3d 1453, 2018-Ohio-3026, 103 N.E.3d 832, 2018 WL 3649994, ¶¶ 44-45 (2018).

{¶11} In Fry's fourth Assignment of Error, Fry contends he demonstrated there was a genuine issue of material fact for trial that Wheatland negligently retained and supervised Hoffman.

{¶12} The trial court determined, and I would affirm, that Hoffman was not Fry's supervisor as a matter of law. The trial court also held, and I would affirm, Fry did not establish there was a genuine issue of material fact that Hoffman sexually harassed Fry because of Fry's sex, thereby foreclosing Fry's claim for sexual harassment pursuant to R.C. 4112.02(A).

{¶13} I therefore would find Fry's claim for negligent retention and supervision, fails as a matter of law. A negligent hiring claim can only be asserted against Wheatland as the employer and not individuals. *Colston v. Cleveland Pub. Library*, 522 Fed.Appx. 332, 338, 118 Fair Empl.Prac.Cas. (BNA) 259, 2013 WL 1500438, *6 (6th Cir.2013).

{¶14} In order to prevail on a negligent hiring claim, Fry must show that an accused employee be individually liable for a tort against Fry, who then seeks recovery against the employer. *Colston, supra* citing *Greenberg v. Life Ins. Co. of Virgi*nia, 177 F.3d 507, 517 (6th Cir.1999) (citing *Strock v. Pressnell*, 38 Ohio St.3d 207, 527 N.E.2d 1235, 1244 (1988)). However, Fry failed to establish that any employee of Wheatland is, in fact, liable for a tort against him. In order to prevail on a negligent hiring claim, Fry must prove tort liability. *Id.* citing *Greenberg*, 177 F.3d at 517 (citation omitted).

{¶15} Fry finally contends in his fifth Assignment of Error that the trial court erred when it found Wheatland was entitled to judgment as a matter of law on Fry's claim for intentional infliction of emotional distress. The trial court found Fry was unable to meet his burden to establish that Hoffman intended to cause harm to Fry or that Hoffman's behavior was so extreme and outrageous it shocked the conscious of the community.

{¶16} A successful intentional infliction of emotional distress claim requires a plaintiff to prove: (1) the defendant intentionally or recklessly caused the plaintiff serious

emotional distress; (2) the defendant's conduct was "extreme and outrageous"; and (3) the defendant's conduct proximately caused the plaintiff serious emotional distress. *White v. Bhatt*, 5th Dist. No. 17CA30, 2017-Ohio-9277, 102 N.E.3d 607, 2017 WL 6618857, ¶ 36, *appeal not allowed,* 152 Ohio St.3d 1479, 2018-Ohio-1990, 98 N.E.3d 294, 2018 WL 2357186, ¶ 36 (2018) citing *Phung v. Waste Mgmt., Inc.* (1994), 71 Ohio St.3d 408, 410, 644 N.E.2d 286; *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 453 N.E.2d 666, syllabus.

{¶17} In other words, to prove a claim of intentional infliction of emotional distress, the plaintiff must show that the defendant intentionally or recklessly caused him serious emotional distress by extreme and outrageous conduct." *Mills v. Sonoco Phoenix*, 5th Dist. Stark No. 2013 CA 00067, 2014-Ohio-366, 2014 WL 463208, ¶ 22 citing *Stafford v. Columbus Bonding Ctr.,* 177 Ohio App.3d 799, 809, 2008–Ohio–3948, 896 N.E.2d 191 (10th Dist.), citing *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666 (1983).

{¶18} The Ohio Supreme Court has described the outrageous behavior that supports this type of claim as requiring something beyond a "tortious or even criminal" intent to cause harm. *Yeager v. Local Union 20,* (1983) 6 Ohio St.3d 369, 374–75, 453 N.E.2d 666 (1983), abrogated on other grounds by *Welling v. Weinfeld,* 113 Ohio St.3d 464, 2007–Ohio–2451, 866 N.E.2d 1051. "[I]n order to state a claim alleging the intentional infliction of emotional distress, the emotional distress alleged must be serious." "[S]erious emotional distress" is "emotional injury which is both severe and debilitating." "[S]erious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by

the circumstances of the case." (Citations omitted). *Smith v. Redecker,* 4th Dist. No. 08CA33, 2010–Ohio–505, at ¶ 60.

{¶19} Additionally, "[e]xpert medical testimony is not indispensable to a claim of serious emotional distress. * * * More particularly, as an alternative and in lieu of expert testimony, a plaintiff may submit the testimony of lay witnesses who are acquainted with the plaintiff as to any 'marked changes in the emotional or habitual makeup' of the plaintiff following a defendant's allegedly culpable conduct." *Powell v. Grant Med. Ctr.* (2002), 148 Ohio App.3d 1, 6, 771 N.E.2d 874 (citations omitted).

{¶20} Fry argues Hoffman subjected him to daily offensive comments and touching. Fry complained to Wheatland regarding Hoffman's behaviors to no avail. As a result of Hoffman's behaviors and Wheatland's inaction, Fry complains he suffers from emotional distress in the form of anxiety, depression, nightmares, insomnia, and sexual dysfunction.

{¶21} As I stated above, I do not doubt that Hoffman's alleged behaviors were offensive to Fry and inappropriate for the workplace. But accepting all of Fry's allegations as true, I would find that Fry failed to produce evidence of conduct that was so extreme and outrageous as to go beyond all possible bounds of human decency.

{¶22} Further, the Civ.R. 56 evidence does not demonstrate that Hoffman's actions caused serious emotional distress and affected Fry's work performance. Parks reported that Hoffman and Fry were an effective team, which Fry did not dispute. Fry did not testify his absences from Wheatland were due to Hoffman's behaviors. Fry did not seek mental health treatment while he was employed at Wheatland.

{¶23} I find no error by the trial court to grant summary judgment in favor of Wheatland on Fry's claim for intentional infliction of emotional distress.

{¶24} For these reasons, I would affirm the judgment of the trial court