[Cite as *McGuire v. Newark*, 2020-Ohio-4226.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| KAYLA MCGUIRE | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellant | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2019 CA 00095 |
| | : | |
| CITY OF NEWARK, ET AL. | : | |
| | : | |
| | : | |
| Defendants-Appellees | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Licking County Court of
                             Common Pleas, Case No. 18 CV 00493



JUDGMENT:                    AFFIRMED IN PART; REVERSED &
                             REMANDED IN PART



DATE OF JUDGMENT ENTRY:      August 26, 2020



APPEARANCES:

For Plaintiff-Appellant:                For Defendants-Appellees:

MICHAEL T. CONWAY                       PATRICK KASSON
3456 Sandlewood Dr.                     THOMAS N. SPYKER
Brunswick, OH 44212                     200 Civic Center Drive, Suite 800
                                        Columbus, OH 43215

*Delaney, J.*

{¶1}   Plaintiff-Appellant Kayla McGuire appeals the August 27, 2019 judgment entry of the Licking County Court of Common Pleas.

**FACTS AND PROCEDURAL HISTORY**

**Complaint and Motion for Summary Judgment**

{¶2}   On May 8, 2018, Plaintiff-Appellant refiled her original complaint against Defendants-Appellees City of Newark and Safety Director Steven Baum (hereinafter "City of Newark") alleging the defendants engaged in unlawful discriminatory practices in violation of R.C. 4112.02. McGuire claimed that during her employment with the City of Newark as a police officer, she was subjected to discrimination because of her sex.

{¶3}   In Count One of her complaint, she alleged discrimination and retaliation by the City of Newark, in violation of R.C. 4112.99 and 4112.02(I). R.C. 4112.99 states, "Whoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief." R.C. 4112.02(I) states:

> For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

{¶4}   In Count Two, McGuire alleged the conduct of Safety Director Steven Baum, sued in his individual capacity, was a violation of R.C. 4112.02(J). The statute reads:

(J) For any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice.

{¶5}   In Count Three, McGuire sued Baum in his individual capacity for violations of R.C. 4112.99 (discrimination) and 4112.02(I) (retaliation).

{¶6}   The City of Newark filed a motion for summary judgment on April 12, 2019, arguing there were no genuine issues of material fact so that it was entitled to judgment as a matter of law on McGuire's claims of gender discrimination. In its motion for summary judgment, City of Newark claimed McGuire could not establish gender discrimination, sexual harassment, retaliation, or hostile work environment. It further contended that Baum, as an employee of a political subdivision, was entitled to immunity under R.C. 2744.03(A)(6).

{¶7}   McGuire responded to the motion for summary judgment. In support of her response to the motion for summary judgment, McGuire attached the affidavit of former City of Newark police officer, Jared Angle. On May 29, 2019, City of Newark filed a motion to strike the affidavit of Jared Angle. In support of the motion, City of Newark filed Angle's deposition.

{¶8}   The following facts are based on the Civ.R. 56 evidence submitted by the parties.

**Conditional Employment**

{¶9}   Plaintiff-Appellant Kayla McGuire graduated from Ohio State University in 2013 with a bachelor's degree in political science and the Ohio Police Officer Training Academy in 2015. In May 2016, she interviewed with the City of Newark Division of Police and on June 6, 2016, she was offered a probationary appointment to the position of Police Officer effective on June 20, 2016. Her annual salary was $40,655.30. The letter notifying McGuire of her employment offer stated that her continued employment in the position of Police Officer would be based upon the satisfactory completion of the one-year probation period from the date of appointment.

{¶10} Three men were also offered conditional employment positions as police officers with the City of Newark Division of Police: Derrick Beach, Adam Carter, and Oren Nauman. McGuire, Beach, Carter, and Nauman comprised the June 2016 class of police officer trainees for the City of Newark.

{¶11} In 2016, the City of Newark employed four full-time female police officers and one female reserve police officer. Three female police officers were assigned to patrol.

**Police Training Officer Program**

{¶12} The Defendant-Appellee City of Newark utilizes the Police Training Officer ("PTO") Model for training and evaluating new police trainees. The PTO program, according to the "PTO Manual/A Problem-Based Learning Manual for Training and Evaluating Police Trainees," is a problem-based learning model based on community-oriented policing. The focus of the program is on the trainee's learning capacity and problem-solving skills. The evaluation process for trainees involves multiple activities:

informal assessment of daily activities through completing daily journal entries and dialogue, weekly coaching and training reports, problem-based learning exercises, neighborhood portfolio exercise, week-long mid-term evaluation, and a week-long final evaluation. The PTO is the police officer primarily responsible for guiding the trainee through the program. The PTO provides daily coaching and training to the trainee, documents training provided through a weekly coaching and training report, and keeps the Police Training Supervisors informed about pertinent issues associated with a trainee. During the PTO program, the trainee is expected to steadily improve. According to Barry L. Connell, Chief of Police for the City of Newark, the PTO program does not compare the performances of the trainees.

{¶13} The PTO program is fifteen weeks long and broken into phases: integration phase, Phase A/non-emergency incident response, Phase B/emergency incident response, mid-term evaluation, Phase C/patrol activities, Phase D/criminal investigation, and final evaluation. The phases are three weeks long. The PTO supervises the trainee during each phase and performs the mid-term evaluation and the final evaluation. The mid-term and final performance evaluation grades the trainee as passing or failing 15 different areas: police vehicle operation; conflict resolution; response to resistance and aggression; local procedures, policies, laws and organizational philosophies; report writing; teamwork; problem solving skills; community specific problems; cultural diversity and special needs groups; legal authority; individual rights; officer safety; communication skills; ethics; and lifestyle stressors, self-awareness, and self-regulation.

**McGuire's Training**

{¶14} McGuire began her Phase A training on July 6, 2016 with Officer David Arndt as her PTO. On July 8, 2016, Patrol Sergeant Al Shaffer commented in the coaching and training report that, "Officer McGuire had a great deal of information thorn [sic] at her this week and appears to understand the issue and challenges. Her issues are common for most young officers and I expect her to continue the learning process." Officer Arndt averred in his affidavit that during Phase A, McGuire "showed deficient performance in listening to her radio, operating her spotlight, navigation, and officer safety and situation awareness. McGuire also struggled incorporating my feedback and training." McGuire testified that she did not receive any unfair criticisms during her first three-week training session. (McGuire Depo., 72).

{¶15} Officer Tim Fleming was McGuire's PTO for Phase B starting on July 27, 2016. McGuire stated her training with Fleming differed from her training with Arndt because "Fleming just sat back and didn't give me any criticism for the first week or so. He just wouldn't help me at all." (McGuire Depo., 74). Fleming stated in his affidavit that during Phase B, "McGuire showed deficient performance in operating her radio, operating police equipment, navigation, officer safety and situation awareness, and she struggled incorporating my feedback and training to improve her performance." Her Phase B training was extended for two weeks beginning August 6, 2016, where Fleming handled the calls and McGuire observed.

{¶16} Officer John Purtee conducted McGuire's Mid-Term Evaluation from August 24, 2016 to August 27, 2016. The evaluation showed that McGuire passed the areas of conflict resolution; response to resistance and aggression; report writing; teamwork;

community specific problems; cultural diversity and special needs; individual rights; ethics; and lifestyle stressors, self-awareness, and self-regulation. McGuire failed in the areas of police vehicle operation; local procedures, policies, laws, and organizational philosophies; problem solving skills; legal authority; officer safety; and communication skills. Purtee attached a document to the Mid-Term Evaluation form which described in greater detail the areas where McGuire needed improvement. For example, in the area of police vehicle operation, Purtee elaborated that McGuire had trouble finding addresses, her regular patrol speeds were too fast, and she did not seem comfortable in the car when driving in emergency response. Purtee recognized that McGuire had made improvements and was trying hard. He recommended that McGuire move on to Phase C and her PTO's focus should be on McGuire's problem areas. McGuire was cautioned, however, that if improvement was not made in those areas and she was unable to pass the final, Purtee would recommend termination because the areas listed in the evaluation were serious and he was concerned for her safety.

{¶17} When McGuire shadowed Purtee, McGuire felt that he treated her like a child. He did not give her the opportunity to do anything.

{¶18} On August 31, 2016, McGuire started her Phase C training with Officer David Arndt as her PTO. During Phase C, trainees are expected to show significant improvement from Phase A. Arndt stated in his affidavit that McGuire continued to show deficient performance in the same areas she struggled with during Phase A. In the September 14, 2016 Coaching and Training Report, Arndt stated it was his opinion that McGuire was trying but her biggest weakness was her confidence, which could have been compounded by her lack of knowledge and assertiveness.

{¶19} McGuire started her Phase D training with Fleming. On September 24, 2016, he completed the Coaching and Training Report, wherein Fleming reported McGuire was not performing at the level expected during Phase D. He did not see improvement in McGuire's performance after reviewing her prior Coaching and Training Reports. Fleming's September 29, 2016 Coaching and Training Report stated McGuire was "tactically unsound."

{¶20} Officer Purtee conducted McGuire's Final Performance Evaluation on October 19, 2016 to October 22, 2016. During her final evaluation, McGuire was to operate as if she were working without supervision. The evaluation showed that McGuire passed the areas of police vehicle operation; response to resistance and aggression; report writing; teamwork; cultural diversity and special needs; and lifestyle stressors, self-awareness, and self-regulation. McGuire failed in the areas of conflict resolution; community specific problems; local procedures, policies, laws, and organizational philosophies; problem solving skills; legal authority; officer safety; individual rights; and ethics. Purtee attached a document to the Final Evaluation, which stated:

> Off [sic] McGuire has a problem in the area of law of procedure. She also fails to identify danger and does not think people pose a danger to her, mostly because she knows them. Off [sic] McGuire does not think on her feet and has trouble making decisions. Off [sic] McGuire has a problem taking responsibility for her mistakes. I have listened countless times to her complain that it was Off [sic] Fleming's fault she did not do well. She also stated that Off [sic] Fleming and Off [sic] Arndt have to [sic] completely

different teaching styles. The latest was that Off [sic] Fleming, Off [sic] Arndt and I have the same personalities.

After reviewing her training records and discussion with her PTO, Purtee felt the City of Newark had exhausted its options to assist McGuire correct her training deficiencies. He did not think she was suited for the fast pace and call volume of the Newark Police Department.

### McGuire's Experiences During Training

{¶21} As soon as she started her police officer training, McGuire said she was subjected to microaggressions from City of Newark police officers. Officer Matt Smith, approximately 52 years old, repeatedly asked McGuire to go on dates with him. McGuire repeatedly declined. After she was hired by the City of Newark but before she was in the PTO program, Smith tried to kiss her. Smith was not involved with McGuire's training. Other police officers teased McGuire about Smith's behavior.

{¶22} Officer Phil Palmesano repeatedly called McGuire a "pork chop." McGuire stated,

He kept calling me pork chop. I don't know what it pertains to. But he kept calling me a pork chop and then he would make fun of me by saying oh he sleeps with anything that doesn't have a thing between his legs. You should have went out with him. It would have been funny.

(McGuire Depo., 19). Palmesano made the comments while he and McGuire were arresting a criminal suspect. A "pork chop" refers to a female who is younger than the man in a relationship. (McGuire Depo., 116). McGuire called Palmesano an "ass" and he stopped his commentary.

{¶23} McGuire complained to Fleming, her training officer, about Palmesano's comments. McGuire said Fleming laughed about the comments and did nothing. Fleming also called McGuire a "pork chop" about once or twice a week. McGuire did not respond to Fleming because he was her training officer.

{¶24} At another point during her training, McGuire and other City of Newark police officers responded to a disturbance at a local bar. The suspects were no longer at the bar when the police arrived. Some bar patrons said hello to McGuire because they went to high school together. As the police officers were leaving the bar, Officer Karson Slee stated, "we had to get her out of there before they got her on top of the bar and started dancing or something in front of Officer Phillips and Officer Fleming." (McGuire Depo., 24). Slee was not involved in McGuire's training. McGuire was offended at the comment and felt it was unprofessional, so she later complained to Fleming. Fleming responded it was a joke.

{¶25} During week three of her training, Sergeant Bline told McGuire that they were harder on her because she was a female of a smaller stature. She said to Fleming that she did not understand why they are hard on her just because she was a female of smaller stature because she felt she had proved herself. Fleming responded that they had to be harder on her because she was smaller.

{¶26} Jared Angle was a police officer with the City of Newark from June 2003 to November 2017.[1] In 2019, Angle was suing the City of Newark and the police department. While a police officer, he was not involved with McGuire's training, but he was present in

---

[1] In support of her response to the City of Newark's motion for summary judgment, McGuire attached Angle's affidavit. The City of Newark moved to strike the affidavit and filed Angle's deposition to support its motion to strike the affidavit.

the department while McGuire in the PTO program. He spoke with McGuire and answered her questions while she was completing her paperwork.

{¶27} Angle witnessed other police officers make comments about McGuire during the PTO program. The officers teased McGuire about her economic status and where she resided, an alleged lower income area in Newark. (McGuire Depo., 120; Angle Depo., 30, 45). He heard Officers Bline, Arndt, and Fleming make comments that McGuire would be better off being a stripper. (Angle Depo., 32, 59). He heard Bline and Fleming state it wouldn't be long before Smith would be fucking McGuire. (Angle Depo., 53).

### McGuire's Termination from the PTO Program

{¶28} On or about October 25, 2016, McGuire asked to meet with Police Captain Craig Riley. McGuire was at the end of the 12 weeks PTO program and to move forward, she felt she needed more training. She felt she was doing all parts of her job correctly, but she did not feel confident in her abilities because of training inconsistencies between her training officers and the lack of support from her training officers. She requested more training in the field.

{¶29} McGuire also told Riley that she was dealing with an officer teasing her about another officer hitting on her. Riley told McGuire he would look into it.

{¶30} Chief Barry Connell spoke with McGuire on October 27, 2016. When she came into his office, she saw a letter on his desk that stated she had been placed on administrative leave. McGuire told Connell that she had been dealing with discrimination and gave him the details of her experiences. She also told Connell that she had been harshly evaluated because her training officers constantly compared her to the other two officers in the field training program.

{¶31} On October 27, 2016, the City of Newark placed McGuire on administrative leave pending the resolution of the documented training deficiencies and a review by the Chief of Police and Safety Director.

{¶32} The City of Newark never investigated McGuire's complaints of sexual harassment because no reports were made. (Connell Depo., 147).

{¶33} On November 10, 2016, Fleming provided Police Captain Craig Riley with a summary of his review of McGuire's Phase D training. His summary included examples of McGuire's problems during training. At the conclusion, Fleming stated his opinion was that McGuire could not be trusted to be on her own for her own safety and other officers' safety. "Ofc. McGuire does fine on the basic report call, but if you introduce an [sic] stress to the call, she freezes up and makes tactical mistakes."

{¶34} McGuire met with Defendant-Appellee City of Newark Safety Director Steven Baum. Baum notified McGuire that her employment was terminated. Her termination was based on the recommendation on Connell, Riley, and the PTO officers. (Connell Depo., 142). He told her that she was not a bad employee, but she was not meant to be a police officer in Newark. She would be better off in a location with less call volume and less confrontation. (McGuire Depo., 122). McGuire interpreted Baum's recommendation as gender bias because she was a female of smaller stature, who could be more susceptible to harm and more of a risk. (McGuire Depo., 122).

{¶35} After McGuire's termination, she did not seek mental health treatment. She suffered from loss of sleep, weight gain, and emotional stress. She applied to other police departments but could not find employment. She returned to her prior employment at Aldi's until she joined the Army as a medic. As a military medic, she took a pay cut. In

2018, McGuire was a medic at Fort Gordon DDEAMC Bravo Company, Eisenhower Medical Center. (McGuire Depo., 134).

**McGuire Compared to Beach**

{¶36} The City of Newark hired McGuire and Derrick Beach as part of the June 2016 class of police officer trainees. Beach had different training officers than McGuire for the entirety of the PTO program. Beach and McGuire did not work together but may have responded to some calls at the same time. McGuire alleged that while Beach had a comparable training record to McGuire's, Beach was permitted to graduate from the PTO program while McGuire was terminated from the program.

{¶37} Connell stated the PTO program did not compare the performances of the trainees. McGuire stated her training officers compared her to other officers in training. (McGuire Depo., 94). Her training officers would speak about events that occurred with other trainees, such as a Beach leaving his patrol vehicle running overnight or a trainee leaving weapons in an impounded car. McGuire was also told that Beach left his shotgun in the report writing room. Officer Purtee told McGuire that she was smaller than another trainee or that Beach handled calls like a jerk because sometimes you had to be a jerk. (McGuire Depo., 97). McGuire said the training officers did not compare her to the trainees in an unflattering way. (McGuire Depo., 96).

{¶38} In Phase A, the July 6, 2016 Coaching & Training Report by Bline stated that there were no major concerns during Beach's first week. In Phase C, Bline reported on August 27, 2016, that Beach continued to perform well and was gaining confidence. On September 3, 2016, Bline stated in the Coaching & Training Report that Beach had

several large and confusing calls during the training phase, but he seemed to do well. Bline stated he heard and observed no large problems.

{¶39} Arndt conduced Beach's Mid Term Performance Evaluation from August 17, 2016 to August 20, 2016. Beach passed all areas to be evaluated. Arndt stated in his comments:

I would recommend Officer Beach move on to Phase C. Office Beach excelled during his mid term period. He has demonstrated that he can handle the tasks that are expected of him in both Phase A and B. There are still areas for improvement, but Officer Beach is able to identify these areas on his own and find solutions without help from me. An example of this is his navigation of the City. Officer Beach is not from Newark but he has a good understanding at this time of streets and addresses. If Officer Beach does not know where something is he uses his resources and does not rely on the PTO to help him. I feel Officer Beach will excel at the next phases of training.

{¶40} Arndt conducted Beach's Final Performance Evaluation from October 19, 2016 to October 23, 2016. Beach passed all areas to be evaluated. The comments stated, "I would recommend Officer Beech [sic] to move onto patrol on his own. Officer Beech [sic] has demonstrated to be competent in the core competency's [sic]. Improvements in navigation can still be made [sic] Officer Beech [sic] does have the skills and knowledge to use his resources without prompting or help from a PTO. I see no reason why Officer Beech [sic] will not be successful."

{¶41} After the probationary period or around the end of the probationary period, Beach was placed on administrative leave for punching a handcuffed individual in the stomach. (McGuire Depo., 100).

**Judgment**

{¶42} On August 27, 2019, the trial court issued its judgment, granting summary judgment in favor of the City of Newark. It found there were no genuine issues of material fact on McGuire's claims for discrimination and retaliation by the City of Newark of Safety Director Steven Baum. The trial court further considered the claim of hostile work environment that was not specifically plead by McGuire, but instead raised in the parties' summary judgment pleadings. The trial court found the behaviors by the police officers towards McGuire were not severe or threatening so as to affect the terms, conditions, or privileges of her employment.

{¶43} It is from the August 27, 2019 judgment entry that McGuire now appeals.

**ASSIGNMENTS OF ERROR**

{¶44} McGuire raises four Assignments of Error:

{¶45} "I. THE TRIAL COURT REVERSIBLY ERRED TO THE PREJUDICE OF THE APPELLANT POLICE OFFICER KAYLA MCGUIRE WHEN IT DISMISSED HER OHIO R.C. 4112.02(A) SEX DISCRIMINATION CLAIM ON APPELLEE'S SUMMARY JUDGMENT MOTION USING THE SINGLE JUSTIFICATION THE APPELLANT WAS NOT QUALIFIED FOR EMPLOYMENT WITH THE DEFENDANT-APPELLEE CITY OF NEWARK POLICE DEPARTMENT.

{¶46} "II. THE TRIAL COURT REVERSIBLY ERRED TO THE PREJUDICE OF THE APPELLANT POLICE OFFICER KAYLA MCGUIRE WHEN IT DISMISSED HER

OHIO R.C. 4112.02(A) SEXUAL HARASSMENT CLAIM ON APPELLEE'S SUMMARY JUDGMENT MOTION USING THE JUSTIFICATION THE APPELLANT DID NOT SHOW SHE WAS A VICTIM OF SEVERE OR THREATENING SEXUAL HARASSMENT.

{¶47} "III. THE TRIAL COURT REVERSIBLY ERRED TO THE PREJUDICE OF THE APPELLANT POLICE OFFICER KAYLA MCGUIRE WHEN IT DISMISSED HER OHIO R.C. 4112.02(I) RETALIATION CLAIM ON APPELLEE'S SUMMARY JUDGMENT MOTION USING THE JUSTIFICATION THE APPELLANT DID NOT TAKE AN OVERT STAND AGAINST BEING SUBJECT TO APPELLEE'S CONDUCT THAT SHE CLAIMED EVIDENCED A VIOLATION OF OHIO 4112.02 ET SEQ. NOR IN EFFECT THAT THE CONDUCT OF THE APPELLEE'S POLICE OFFICERS WAS RETALIATORY.

{¶48} "IV. THE TRIAL COURT REVERSIBLY ERRED TO THE PREJUDICE OF THE APPELLANT POLICE OFFICER KAYLA MCGUIRE WHEN IT DISMISSED HER OHIO R.C. 4112.02(J) AIDING AND ABETTING SEX DISCRIMINATION AND/OR RETALIATION CLAIM AGAINST DEFENDANT-APPELLEE NEWARK SAFETY DIRECTOR STEVEN BAUM ON APPELLEE'S SUMMARY JUDGMENT MOTION USING THE SINGLE JUSTIFICATION SAFETY DIRECTOR BAUM WAS IN EFFECT PERSONALLY IGNORANT OF THE FACT THE APPELLEE CITY OF NEWARK POLICE DEPARTMENT HAD ENGAGED IN DISCRIMINATION OR RETALIATION AGAINST THE APPELLANT BECAUSE OF HER SEX AND MAKING COMPLAINTS ABOUT SEX DISCRIMINATION."

## ANALYSIS

## Standard of Review

{¶49} McGuire argues the trial court erred when it granted City of Newark's motion for summary judgment. We refer to Civ.R. 56(C) in reviewing a motion for summary judgment which provides, in pertinent part:

Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶50} The moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court, which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). The nonmoving party then has a reciprocal burden of specificity and cannot rest on the allegations or denials in the pleadings, but must set forth "specific facts" by the

means listed in Civ.R. 56(C) showing that a "triable issue of fact" exists. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801 (1988).

{¶51} Pursuant to the above rule, a trial court may not enter summary judgment if it appears a material fact is genuinely disputed. *Vahila v. Hall*, 77 Ohio St.3d 421, 429, 674 N.E.2d 1164 (1997), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996).

{¶52} As an appellate court reviewing summary judgment motions, we must stand in the shoes of the trial court and review summary judgments on the same standard and evidence as the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 506 N.E.2d 212 (1987).

## I.      Gender Discrimination

{¶53} McGuire argues in her first Assignment of Error that the City of Newark engaged in gender discrimination when it terminated her employment as a police officer.

### A. Governing Law

{¶54} R.C. 4112.02(A) states that it is an unlawful discriminatory practice "[f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.99 authorizes civil actions for any violations of R.C. Chapter 4112. Generally, Ohio courts look to federal anti-discrimination case law when examining employment discrimination cases made under state law. *Housden v. Wilke Glob., Inc.*, 10th Dist. No. 17AP-420, 2018-Ohio-3959, 111 N.E.3d 1264, 2018 Fair Empl.Prac.Cas.

(BNA) 357890, 2018 WL 4677518, ¶ 17 citing *Nelson v. Univ. of Cincinnati*, 10th Dist. No. 16AP-224, 2017-Ohio-514, 75 N.E.3d 1304, ¶ 31, citing *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781, ¶ 15. *But see Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, 837 N.E.2d 1169, ¶ 31 (stating that Ohio courts are not bound to federal interpretation of analogous statutes).

{¶55} In Ohio, an employee may establish discriminatory intent directly or indirectly using the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Ceglia v. Youngstown State Univ.*, 2015-Ohio-2125, 38 N.E.3d 1222, ¶ 15 (10th Dist.). Under the three-step *McDonnell* analysis, the employee must first establish a prima facie case of discrimination. *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Com.*, 66 Ohio St.2d 192, 197, 421 N.E.2d 128 (1981). The employee must show she was "(1) a member of a protected class, (2) discharged, (3) qualified for the position, and (4) replaced by a person from outside the protected class." *Stookey v. S. Shore Transp. Co.,* 6th Dist. Erie No. E-11-044, 2012-Ohio-3184, 2012 WL 2866679, ¶ 10. "[T]he fourth prong may also be satisfied by facts that establish the employee was a member of a protected class and he or she was treated differently than similarly situated, non-protected employees engaging in the same or similar conduct." *Id.*

{¶56} Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Shields v. Sinclair Media III, Inc.*, S.D.Ohio No. 1:18-CV-593, 2020 WL 3432754, *7 (June 23, 2020) citing *Henry v. Abbott Laboratories*, 651 F. App'x 494, 499 (6th Cir. 2016) (citing *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 240

(6th Cir. 2005)). If the employer satisfies this burden, the burden of production then shifts back to the plaintiff to show that the employer's proffered legitimate, nondiscriminatory reason for the adverse employment action was mere pretext for intentional discrimination. *Id.* (citing *White*, 429 F.3d at 238). The plaintiff may demonstrate pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Shields, supra* citing *Davis v. City of Clarksville*, 492 F. App'x 572, 580 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). To survive summary judgment, the plaintiff "must produce sufficient evidence from which a jury could reasonably reject" the defendant's explanation for the termination. *Davis*, 492 F. App'x at 580 (quoting *Chen*, 580 F.3d at 400).

{¶57} The United States Supreme Court recently addressed Title VII, the federal codification of the Civil Rights Act of 1964, which makes it "unlawful * * * for any employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate any individual * * * because of such individual's race, color, religion, sex, or national origin." *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020) citing 42 U.S.C. §2000e-2(a)(1). In determining that an employer violates Title VII if an employer fires an employee merely for being gay or transgender, the Supreme Court re-examined employment discrimination "because of sex." The Court held:

> An employer violates Title VII when it intentionally fires an individual employee based in part on sex. It makes no difference if other factors besides the plaintiff's sex contributed to the decision or that the employer treated women as a group the same when compared to men as a group. A

statutory violation occurs if an employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee.

*Bostock v. Clayton Cty., Georgia*, 140 S.Ct. 1731, (2020)

### B. Prima Facie Case

{¶58} We examine the elements of the *McDonnell* analysis to determine if the trial court correctly granted summary judgment in favor of the City of Newark on the issue of gender discrimination. We note for our analysis there is no factual dispute that McGuire is a member of a protected class and was discharged from her employment.

### 1. Qualified for the Position

{¶59} City of Newark argued in its motion for summary judgment there was no genuine issue of material fact that McGuire was not qualified for the position of police officer for the City of Newark. For a plaintiff to show that she is qualified for a position, she "must show that she was performing at a level which met defendant's legitimate expectations." *Murry-Zizi v. Johnson*, 2015 Fair Empl.Prac.Cas. (BNA) 182784, 2015 WL 687248, *3 (E.D.Mich.Feb. 18, 2015) citing *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 929 (6th Cir.1999). "When assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage ... a court must examine plaintiff's evidence independent of the nondiscriminatory reason produced by the defense ..." *Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir.2002).

{¶60} It has also been held that in evaluating the qualifications component of the prima facie case, the trial court looks only to the applicant's general, objective qualifications, including his "education, experience in the relevant industry, and demonstrated possession of the required general skills." *Litton v. Dep't of Human*

*Resources*, E.D. Tenn. No. 2:17-CV-127, 2020 WL 1518806, *8 (Mar. 30, 2020) citing *Wexler v. Whit's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003) (en banc). "The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id.*

{¶61} McGuire came to the City of Newark PTO program with a bachelor's degree in political science from the Ohio State University and after graduating from the Ohio Police Officer Training Academy. Educationally, it appears there is no genuine issue of material fact that McGuire was minimally qualified to be a police officer for the City of Newark. The PTO program, however, is an additional layer of training required of police officers for the City of Newark.

{¶62} McGuire contends she was qualified to be a police officer for the City of Newark but she could not meet the expectations of the PTO program because she was subjected to gender discrimination during the program. She states that because of her sex, when she requested more guidance and training time, she was denied by her training officers. When she asked for feedback, her training officers refused. She was held to different training standards than her male peers. During week three of her training, McGuire stated in her deposition that she was told by Sergeant Bline that they were harder on her because she was a female of a smaller stature. She said to Fleming that she did not understand why they were hard on her because she felt she had proved herself. Fleming responded that they had to be harder on her because she was smaller.

{¶63} In response to McGuire's prima facie argument as to qualifications, the City of Newark points to the records generated from the PTO program as evidence that

McGuire struggled during her training and failed to meet the expectations of the program. The City of Newark gave McGuire two additional weeks of training during the PTO program. There is no dispute that McGuire failed to pass a majority of the PTO program areas of evaluation as shown in her mid-term and final evaluations. McGuire was evaluated by three training officers and they held the same opinion regarding her inability to meet the areas of evaluation during her progression through the program.

{¶64} The only evidence in the record that supports McGuire's argument that she was qualified for the position of police officer with the City of Newark is McGuire's deposition. During her deposition, however, McGuire gave contradictory answers as to whether she was qualified for the position at the completion of the PTO program:

Q. Okay. When you went to Captain Riley [at the end of training] and said I would like to have more training, were you talking about the training you already had previously done in those three four-week sessions?

A. Yes.

* * *

Q. Why did you think you needed more training in the field?

A. Because I had inconsistencies in my training. I was being told by three different officers how to do things and it just – they were not helping at all. They would just throw me to the wolves. I would ask questions and they would not respond.

Q. Was it your feeling that you were not performing well in the field?

A. No.

Q. Okay. Were you performing well in the field?

A. Yes.

Q. Why would you need additional training?

A. Because of inconsistencies. I was not feeling confident in my ability because of the inconsistencies. I wasn't sure of certain policies because of the inconsistencies.

Q. I understand that. But if you are performing well in the field why would it matter?

A. Because I like to make sure I'm doing my job correctly.

Q. Okay. Were there parts of your job that you didn't think you were doing correctly when you asked for additional training?

A. No, sir.

Q. Okay. So when you go to Captain Riley, you think you're doing well in the field, you think you are doing all parts of your job correctly but you ask for more training; correct?

A. Yes, sir.

Q. What training specifically did you want?

A. Any training I could get.

(McGuire Depo., 12-14).

{¶65} Reviewing the Civ.R. 56 evidence in a light most favorable to McGuire, the record supports the City of Newark's argument that McGuire was not qualified for the position of police officer with the City of Newark at the completion of the PTO program. McGuire's performance during the PTO program shows that McGuire did not meet the City of Newark's legitimate expectations of a police officer for the City of Newark.

## 2. Comparable Employee

{¶66} The fourth prong of the *McDonnell* analysis requires the plaintiff demonstrate she was replaced by a person from outside the protected class. In the alternative, the fourth prong may also be satisfied by facts that establish the employee was a member of a protected class and she was treated differently than similarly situated, non-protected employees engaging in the same or similar conduct.

{¶67} The City of Newark contends that a female police officer replaced McGuire. McKenzie Harris was hired in June 2017 after passing the PTO program. McGuire was terminated on November 14, 2016.

{¶68} In this case, McGuire does not argue she was replaced as a police officer by someone outside of her protected class. She contends she meets the fourth prong of the *McDonnell* analysis because she was treated differently than Derrick Beach, a similarly situated, non-protected employee engaging in the same or similar conduct. Beach was hired with her as part of the June 2016 PTO program.

{¶69} In order for the employee to show that more favorably treated non-protected employees are in fact "comparables," the employee " 'must show the "comparables" are similarly-situated in all respects. In the disciplinary context, the Sixth Circuit has held that to be found similarly situated, "the plaintiff and [her] proposed comparator must have engaged in acts of 'comparable seriousness.' " *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 917, 117 Fair Empl.Prac.Cas. (BNA) 1723, 2013 WL 115587 (6th Cir.2013) To make this assessment of whether an employee is comparable, a court must look "to certain factors, such as whether the individuals 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same

conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " *Id.*

{¶70} Beach and McGuire both participated in the PTO program starting in June 2016. According to Chief of Police Connell, the PTO program does not compare the performances of the trainees. The record shows that different training officers evaluated McGuire and Beach. McGuire was trained by Purtee, Arndt, and Fleming. Purtee conducted McGuire's mid-term and final evaluations. Officer Joseph Phillips and Officer David Burris trained Beach. Arndt conducted Beach's mid-term and final evaluations.

{¶71} A comparison of Beach's and McGuire's evaluations show that Beach passed the all areas of evaluation while McGuire both passed and failed the areas of evaluation. McGuire contends that Beach made errors, such as leaving his shotgun in the record writing room or struggled with navigation, but he was not evaluated negatively or terminated after completing the program.

{¶72} A review of the whole of McGuire's and Beach's training records shows that the experiences of the two trainees during the PTO program were not comparable. Beach and McGuire were subjected to the same evaluation standards of the PTO program, but Beach was evaluated by different training officers. As part of the PTO program, police officer trainees are required to write daily journal entries. The daily journal entries show that Beach and McGuire responded to different calls, so their daily experiences as police officer trainees were not the same. We find that there is no genuine issue of material fact that Beach is not comparable employee to McGuire.

### C. Failure to Establish Prima Facie Case of Gender Discrimination

{¶73} Under the three-step *McDonnell* analysis, the employee must first establish a prima facie case of discrimination. We have reviewed the Civ.R. 56 evidence in a light most favorable to McGuire and find that she has failed to establish a prima facie case of gender discrimination as to her termination from the City of Newark.

{¶74} McGuire's first Assignment of Error is overruled.

### II. Sexual Harassment / Hostile Work Environment

{¶75} In her second Assignment of Error, McGuire contends the trial court erred in finding there was no genuine issue of material fact that McGuire was not subjected to a hostile work environment while she was employed with the City of Newark.

{¶76} In its appellate brief, the City of Newark claims that McGuire did not plead a hostile work environment based on sexual harassment claim in her complaint and is barred from raising the issue on appeal. In Count One of her complaint, McGuire alleged discrimination and retaliation by the City of Newark, in violation of R.C. 4112.99 and 4112.02(I). R.C. 4112.99 states, "Whoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief." R.C. 4112.01(I) regards retaliation. It was the City of Newark that raised the claim of hostile work environment based on sexual harassment in its motion for summary judgment. McGuire responded to the motion for summary judgment and addressed the City's argument. In its judgment entry, the trial court noted McGuire did not plead a claim for hostile work environment or sexual harassment but the parties briefed the issue, so it ruled on the issue. We find the McGuire claimed discrimination under R.C. 4112.99 which relates to a violation of

Chapter 4112. Further, the City of Newark opened the door to a hostile work environment claim and thereby has waived its objection to the pursuit of the claim on appeal.

### A. Governing Law

{¶77} A plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination "because of * * * sex" by proving either of two types of sexual harassment: (1) "*quid pro quo*" harassment, *i.e.,* harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) "hostile environment" harassment, *i.e.,* harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 2000-Ohio-128, 729 N.E.2d 726, paragraph one of syllabus. In this case, McGuire does not argue she was subjected to quid pro quo harassment.

{¶78} In order to establish a claim of hostile work environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Id.* at paragraph two of syllabus.

### B. Unwelcome and Based on Sex

{¶79} The first two elements of a hostile work environment claim are that the harassment was unwelcome and the harassment was based on sex. Reviewing the

Civ.R. 56 evidence in this cased in a light most favorable to McGuire, we find reasonable minds could only conclude that the comments and actions towards McGuire such as calling her a "pork chop," which refers to a younger woman dating an older man; attempting to kiss her; asking her on a date; and telling her she might get on a bar and start dancing would be unwelcome to McGuire. We also find that reasonable minds could only conclude that the male police officers who made the comments and committed the actions towards McGuire was because of her female gender.

**C. Supervisor**

{¶80} We next address the fourth element of the hostile work environment claim that requires McGuire to establish one of two things, (1) her supervisor committed the harassment; or (2) that City of Newark knew or should have known about the harassment and failed to take corrective action.

{¶81} The Ohio Supreme Court has not defined "supervisor" for the purposes of Chapter 4112 liability. *Holland v. Mercy Health*, 2018 IER Cases 427186, 2018 WL 6041359, *8 (N.D.Ohio Nov. 19, 2018). Federal cases applying Title VII are generally applicable to cases involving R.C. Chapter 4112. *Genaro, supra*. Federal district courts within the Sixth Circuit interpreting Title VII have relied on *Vance v. Ball State Univ.*, 570 U.S. 421, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013) – which defines a "supervisor" for purposes of Title VII harassment claims – "to determine whether an individual constituted a supervisor[.]" *Id.* quoting *Ault v. Oberlin Coll.*, 2014 WL 4245991, *12 (N.D. Ohio 2014) (Vecchiarelli, J.), *aff'd in part and rev'd in part on other grounds*, 620 F.Appx. 395 (6th Cir. 2015).

{¶82} Under *Vance, supra*, 570 U.S. at 424, 431, 133 S.Ct. 2434, a "supervisor" is "empowered by the employer to take tangible employment actions against the victim," which means "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Holland v. Mercy Health*, 2018 IER Cases 427186, 2018 WL 6041359, *8 (N.D.Ohio Nov. 19, 2018).

{¶83} Looking at the facts most favorable to the non-moving party, reasonable minds could conclude that McGuire has established the fourth element of the *Hampel* analysis. First, there is a genuine issue of material fact whether Fleming was McGuire's supervisor during the PTO program. Fleming oversaw a portion of McGuire's training and made recommendations for her future in the program. Based in part on Fleming's review of McGuire's performance in the PTO program, McGuire's employment was terminated after her completion of the program.

{¶84} Second, McGuire's allegations of sexual harassment involve Fleming. McGuire complained to Fleming about Palmesano's comments that she was a "pork chop" and she should have gone out on a date with Smith. McGuire said Fleming laughed about the comments and did nothing. Fleming also called McGuire a "pork chop" about once or twice a week. McGuire did not respond to Fleming because he was her training officer.

{¶85} Third, there is a genuine issue of material fact whether the City of Newark was aware or should have been aware of the alleged sexual harassment. McGuire testified in her deposition that she complained to Fleming, her training officer, of the other police officers' harassing comments towards her. McGuire also informed Captain Riley

and Police Chief Connell of the alleged harassment, albeit days before her termination from the program. Riley told McGuire he would look into her allegations. (McGuire Depo., 11-12). Connell stated the City of Newark did not investigate McGuire's claims because she did not make a report. There is no Civ.R. 56 evidence in the record that Fleming, Riley, or Connell took corrective action after McGuire informed them of her experiences.

### D. Severe and Pervasive

{¶86} The third requirement for a claim of hostile work environment is that the harassing conduct be sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726 (2000).

{¶87} In order to be actionable, a hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Fry v. Wheatland Tube, LLC*, 5th Dist. No. 18 CA 7, 2019-Ohio-1453, 135 N.E.3d 420, 2019 WL 1755686, ¶ 67 quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Gatsios v. Timken Co.*, 5th Dist. Stark No. 2011CA00185, 2012-Ohio-2875, 2012 WL 2389664. The severe and pervasive requirement "filters out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.*

{¶88} In determining whether the conduct complained of is sufficiently severe or pervasive to constitute a hostile or abusive work environment, courts must "view the work environment as a whole and consider the totality of all facts and circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment." *Hampel v.*

*Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726 (2000). This determination is fact-specific. *Id*. While no single factor is required, circumstances to consider may include the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely an offensive utterance, whether the conduct unreasonably interferes with an employee's work performance, and whether psychological harm results. *Id*. The work environment must be viewed as a whole, "keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes." *Id*. Accordingly, "even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Id.*

{¶89} Based on McGuire's testimony, she has established a genuine issue of material fact as to whether she subjectively perceived her work environment to be hostile based on the male police officer's actions and comments. The City of Newark argued that McGuire admitted in her deposition that the environment was not subjectively hostile because when she heard Fleming make a comment, McGuire tried to "let it go in one ear and out the other" or when Slee told her she might dance on the bar, she "rolled my eyes and went with my training officers." (McGuire Depo., 23, 24-26). "[T]he subjective component of the prima facie case does not require that a plaintiff report a hostile work environment. A plaintiff can be subjected to sexual harassment sufficiently severe or pervasive as to constitute a hostile environment and yet, for a number of valid reasons, not report the harassment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566, 80 Fair

Empl.Prac.Cas. (BNA) 753, 76 Empl. Prac. Dec. P 46095, 1999 Fed.App. 0289P, 1999 WL 587199 (6th Cir.1999). The plaintiff's "reluctance to report the incidents is entirely understandable considering that one of the alleged aggressors was her supervisor and she wanted to get along at work. *See, e.g., Faragher*, 118 S.Ct. at 2291 (noting that a victim of sexual harassment "may well be reluctant to accept the risks of blowing the whistle on a superior")." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566, 80 Fair Empl.Prac.Cas. (BNA) 753, 76 Empl. Prac. Dec. P 46095, 1999 Fed.App. 0289P, 1999 WL 587199 (6th Cir.1999).

{¶90} The next issue is whether the actions and comments were objectively hostile thereby creating an environment that a reasonable person would find hostile or abusive. The City of Newark contends being asked out by a co-worker does not rise to the level of an objectively hostile work environment, nor do isolated incidents of teasing from co-workers create a hostile work environment. To determine whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment, the court must consider the totality of the circumstances:

> [T]he totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action. Hence, courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility. As one court has noted:

The [severe or pervasive] analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes.

*Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla.1991).

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563, 80 Fair Empl.Prac.Cas. (BNA) 753, 76 Empl. Prac. Dec. P 46095, 1999 Fed.App. 0289P, 1999 WL 587199 (6th Cir.1999)

{¶91} McGuire was in the PTO program from June 2016 to November 2016. During that time she was asked out on a date by another officer; in front of a handcuffed arrestee, an officer told her she should date another officer because that officer will "sleep with anything;" called a "pork chop" once or twice a week; when responding to a disturbance and in front of other male officers, told that she would dance on the top of a bar; and told the officers were harder on her because she was a female of smaller stature. Angle heard Officers Bline, Arndt, and Fleming make comments that McGuire would be better off being a stripper. (Angle Depo., 32, 59). He heard Bline and Fleming state it wouldn't be long before an officer would be fucking McGuire. (Angle Depo., 53). Considering the totality of these circumstances, we find there is a genuine issue of material fact whether a reasonable person would find the cumulative comments towards McGuire would be hostile and abusive.

{¶92} McGuire contends the hostile work environment affected her performance during the PTO program:

Q. Okay. So you're aware that all three of your training officers didn't think you should go to [sic] next step; correct?

* * *

THE DEPONENT: It was my understanding that Officer [Arndt] thought I was able to pass and passed me on to Officer [Fleming]. And then Officer [Fleming] went ahead and passed me on to the Mid Term. And then Officer Purtee went ahead and gave me the okay to continue training instead of reverting back to the first stage. So they continued to pass me on. While all the time I am being teased and called pork chop and my other training officers never given any kind of nicknames.

(McGuire Depo., 115-116).

{¶93} We find McGuire presented sufficient evidence from which reasonable minds could conclude, when considering the totality of all the facts and surrounding circumstances, that the alleged harassing conduct in this case was sufficiently severe or pervasive to affect the conditions of McGuire's employment. We emphasize that this case comes before this Court on a judgment entry granting summary judgment. We recognize that factual disputes remain as to the credibility of witnesses and whether or how certain events took place. However, summary judgment is not the vehicle for weighing the evidence or determining witness credibility. *Fry v. Wheatland Tube, LLC*, 5th Dist. No. 18 CA 7, 2019-Ohio-1453, 135 N.E.3d 420, 2019 WL 1755686, ¶ 66

{¶94} McGuire's second Assignment of Error is sustained.

### III. Retaliation

{¶95} In her third Assignment of Error, McGuire contends the trial court erred when it granted judgment in favor of the City of Newark on her claim for retaliation. We disagree.

{¶96} R.C. 4112.02(I) is an anti-retaliation provision. *Smith v. Allstate Ins. Co.*, 9th Dist. No. 29339, 2019-Ohio-4557, 135 N.E.3d 828, 2019 Fair Empl.Prac.Cas. (BNA) 425791, 2019 WL 5789452, ¶¶ 21-23 citing *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, ¶ 13. Under this provision, it is

> an unlawful discriminatory practice * * * [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

R.C. 4112.02(I). Federal case law regarding Title VII of the Civil Rights Act of 1964 generally applies to R.C. Chapter 4112 violations, including retaliation claims. *Varner v. The Goodyear Tire and Rubber Co.*, 9th Dist. Summit No. 21901, 2004-Ohio-4946, 2004 WL 2244491, ¶ 10, citing *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).

{¶97} An employee must prove the following elements to establish a prima facie case of retaliation: "(1) [he] engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection

between the protected activity and adverse action." *Greer-Burger* at ¶ 13, citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990). Once the plaintiff demonstrates a prima facie case of retaliation, then the burden shifts to the defendant to offer a " 'legitimate, nondiscriminatory reason' for its actions." *Greer-Burger* at ¶ 14, quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). After the defendant satisfies this burden, then the plaintiff must demonstrate that the proffered reason for the adverse action was pretext. *Greer-Burger* at ¶ 14, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

{¶98} "Ultimately, [the plaintiff] will have 'to establish that * * * [his] protected activity was a but-for cause of the alleged adverse action by the employer.' " *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir.2014), quoting *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013). *See Smith v. Dept. of Pub. Safety*, 10th Dist. Franklin, 2013-Ohio-4210, 997 N.E.2d 597, ¶ 60 (The Plaintiff must "prove that retaliation is the but-for cause of adverse employment action."). This means that "the plaintiff must ultimately prove, by a preponderance of the evidence, that the plaintiff's protected activity was the determinative factor in the employer's adverse employment action." *Wholf v. Tremco, Inc.*, 8th Dist. Cuyahoga, 2015-Ohio-171, 26 N.E.3d 902, ¶ 43. Thus, even if the plaintiff is able to establish a prima facie case of retaliation, the plaintiff's retaliation claim fails when " 'it appears from the evidence that the employer would have made the same decision regardless of the plaintiff's participation in the protected activity.' " *Goad v. Sterling Commerce, Inc.*, 10th Dist. Franklin No. 99AP-321, 2000 WL 756386, *10, quoting *Neal v. Hamilton Cty.*, 87

Ohio App.3d 670, 678, 622 N.E.2d 1130 (1st Dist.1993). *See Hall v. Banc One Mgmt. Corp.*, 10th Dist. Franklin No. 04AP-905, 2006-Ohio-913, 2006 WL 465109, ¶ 44-45, 52, rev'd on other grounds by 114 Ohio St.3d 484, 873 N.E.2d 290 (2007); *Boggs v. The Scotts Co.*, 10th Dist. Franklin No. 04AP-425, 2005-Ohio-1264, 2005 WL 647560, ¶ 23.

{¶99} McGuire claims the City of Newark terminated her employment because she complained about gender discrimination and a hostile work environment. She made the complaint to Fleming during her training. She made the complaint to Riley and Connell days before her employment was terminated. Temporal proximity of McGuire's complaint to and her termination alone does not support a claim of retaliation if there is no other compelling evidence. *Fry v. Wheatland Tube, LLC*, 5th Dist. No. 18 CA 7, 2019-Ohio-1453, 135 N.E.3d 420, 2019 WL 1755686, ¶ 86 citing *Boggs v. The Scotts Co.*, 10th Dist. Franklin No. 04AP-425, 2005-Ohio-1264, 2005 WL 647560, ¶ 26 citing *Aycox v. Columbus Bd. of Edn.*, Franklin App. No. 03AP-1285, 2005-Ohio-69, 2005 WL 44441, ¶ 20. The timeline of this case does not establish that but for her complaint, she would not have been terminated for her failure to pass the PTO program. Reasonable minds could only conclude that McGuire was terminated from the PTO program due to her failure to pass the program, as observed by her mid-term and final evaluations.

{¶100}     We find McGuire failed to raise a genuine issue of material fact as to retaliation. Her third Assignment of Error is overruled.

### IV. Individual Liability of Baum

{¶101}     In her fourth Assignment of Error, McGuire contends the trial court erred when it found Safety Director Baum was not individually liable for her claims of

gender discrimination and retaliation. We held above the City of Newark is entitled to judgment as a matter of law on McGuire's claims for gender discrimination and retaliation.

{¶102}    As such, we find the fourth Assignment of Error is moot.

**CONCLUSION**

{¶103}    Based on the foregoing, we find there is a genuine issue of material fact as to the issue of hostile work environment. We find no error when the trial court determined the City of Newark was entitled to judgment as a matter of law as to McGuire's claims for gender discrimination, retaliation, and the individual liability of Safety Director Baum.

{¶104}    The judgment of the Licking County Court of Common Pleas is therefore affirmed in part and reversed in part. The matter is remanded to the trial court for further proceedings consistent with this Opinion and law.

By: Delaney, J.,

Gwin, P.J. and

Wise, John, J., concur.